Campbell, Chief Justice,
delivered the opinion of the court:
The plaintiff entered into a contract with the United States for the construction of a battleship designated “ Battleship No. 14, Nebraska.” A copy of the contract, which bore date as of March 7, 1901, is attached to the original petition. It refers, for authority for the construction of this and other battleships, to the appropriation acts of March 3, 1899, and June 7, 1900 (30 Stat. 1024, 1044, and 31 Stat. 684, 706), and both of these, by appropriate references, adopt the provisions of the act of August 3, 1886 (24 Stat. 215), which, in section 7, prescribes certain conditions relative to changes authorized in the plans and specifications, to the effect that where the cost exceeded $500, changes could only be made upon the order of the Secretary, “ and if changes are thus made, the actual cost thereof and the damage caused thereby shall be ascertained, estimated, *96 .and determined by a board of naval officers to be provided for in the contract; and in any contract made pursuant to this act, it shall be provided, in the terms thereof, that the contractor shall be bound by the determination of said board, nr a majority thereof, as to the amount of increased or •diminished compensation said contractor shall be entitled to receive, if any, in consequence of such change or changes.” This language has important bearing upon the contract provisions relative to changes made the basis of numerous contentions in this case.
The contract called for the completion of the vessel in 36 months, that is, on or before March 7, 1904, but it was not delivered and preliminarily accepted until May 31, 1907, or 74 months and 24 days after the date of the contract. The delay between March 7, 1904, and May 31, 1907, amounted to 38 months and 24 days. Whether the one or the other of the parties was responsible for the delay is a fact to which much testimony is directed. The plaintiff seeks to charge •the Government with 20 months and 8 days of it. It is clear that the Secretary of the Navy made an initial extension of the time of 18 months and 16 days for completion of the vessel because of strikes of workmen, and that he granted five separate extensions covering the whole period of delay.
The changes in plans and specifications were many and important. The provisions of the contract authorized these changes. In the second clause it is provided as follows:
“ No omission in the drawings, plans, or specifications of any detail, object, or provision necessary to carry this contract into full and complete effect, in accordance with the object and intent of the acts of Congress above referred to, shall operate to the disadvantage of the party of the second part, but the same shall be satisfactorily supplied, performed, and observed by the party of the first part, and all claims for extra compensation by reason of, or for, or on account of such extra performance, are hereby, and in consideration of the premises, expressly waived; and it is hereby further provided, and this contract is upon the express condition, that the drawings, plans, and specifications aforesaid may be changed, and that such alterations as are not contrary to law may be made in this contract by the party of the second part, but no such changes shall be made in any respect when the cost thereof shall, in the execution of the *97 work, exceed five hundred dollars ($500), except upon the written order of the Secretary or Acting Secretary of the Navy; that, if changes are thus made, the actual cost thereof, and the damage, if any, caused thereby, shall be ascertained, estimated, and determined by a board of naval officers, appointed by the Secretary of the Navy, and that the party of the first part shall be bound by the determination of said board, or a majority thereof, as to the amount of increased or diminished compensation the said party of the first part shall be entitled to receive, if any, in consequence of such change or changes.”
The statute of 1886 required the provision and all of the parties had notice of the statute. Its meaning went into the contract. The action of the parties in dealing with the question of changes shows that in the beginning, and for a long time after work was begun, the question of the right to make changes was undisputed. Indeed, later still, such a right appears to have been conceded, because in the original petition it is averred that the Secretary of the Navy, from time to time, “ in the exercise of the right reserved to the United States by the condition of said contract hereinbefore set forth,” by written orders changed the drawings, plans, and specifications for the vessel. Other provisions of the contract contemplating changes may be cited as follows:
Clause twelfth provides: “ The party of the second part having approved, as foundation for this contract, drawings, plans, and specifications of a vessel which it has reason to think would, if properly carried out, result in the production of a speed of not less than nineteen (19) knots an hour, assumes no responsibility with reference thereto, and will consider any changes suggested by the party of the first part either as to hull or machinery, and, as the responsibility is with the party of the first part will feel it to be its duty to deal liberally with any proposed changes, so long as the size, strength, and character of the vessel shall remain substantially the same; changes in plans or specifications involving increased or decreased expense to be dealt with as provided for in the second clause of this contract.”
And clause twentieth provides: “ If any doubts or-disputes arise as to the meaning of anything in the drawings, plans, *98 or specifications, or if any discrepancy appear between said drawings, plans, or specifications and this contract, the matter shall be at once referred to the Secretary of the Navy for determination; and the party of the first part hereby binds itself, and its successors and assigns, and its legal representatives, to abide by his decision in the premises.”
These provisions, as well as the statutory provision, clearly show that it was not intended to limit the authorized changes to specific ones, but, on the contrary, to recognize that it had not been definitely decided what would go into the final make-up of a battleship. Stipulating that any changes suggested by the contractor “ either as to hull or machinery ” would be considered and assuming “ no responsibility with reference to its plans,” as stated in clause twelfth, the defendant contracted for the right to make changes and secured that right. The contract was sufficient consideration for it. In clause second it is stipulated that no omission in the drawings, plans, or specifications of any detail should operate to the defendant’s disadvantage and that the same would be supplied by the contractor, who expressly waived claims for extra compensation by reason of such extra performance. We'are dealing with a written contract, which was made upon express condition that changes could be made in drawings, plans, and specifications, and that the method of determining compensation therefor was definitely fixed.
In the case of Wells Bros. Co., 254 U. S. 83 (54 C. Cls. 206), the contract authorized changes, and the claim was for damages occasioned by certain delays. The question for decision was whether the terms of the contract authorized the Government to require such delays without becoming liable to the contractor for damages. The contract also provided that no claim should be made by or allowed to the contractor for any damages caused by delays. The Supreme Court say: “We are dealing with a written contract, plain and comprehensive in its terms,” and they gave full effect to the stipulations and upheld the contract. It was further said: “Men who take million-dollar contracts for Government buildings are neither unsophisticated nor careless. In *99 experience and inattention are more likely to be found in other parties to such contracts than the contractors, and the presumption is obvious and strong that the men signing such a contract as we have here protected themselves against .such delays as are complained of by the higher price exacted for the work.”
It is clear that both parties in the instant case contemplated that changes would be made. It may not be said that they appreciated just what the changes would be. But made they were, and a board of naval officers authorized by the act and the contract was duly appointed by the Secretary of the Navy to ascertain the increased or diminished compensation arising from the changes. Upon the question of whether this board’s action was conclusive a large part of the plaintiff’s claims depend. As already stated, the contract provided that plaintiff should “ be bound by the determination of said board, or a majority thereof, as to the amount of increased or diminished compensation ” it would be “ entitled to receive, if any, in consequence of such change or changes.” The stipulation is a valid one. Wells Bros, case, supra. The contention that the board was not created as provided by the statute, and was therefore “ unlawful,” is not tenable. The statute does not require that the board be named in the contract. It does require that it “ be provided for in the contract.” Its appointment was in the usual way. The suit is upon a contract which implies a valid, not an invalid, one. The authority to make it was conferred by statute and it is to be presumed that both pai’ties intended that the language used should be in consonance with and not contrary to the statute. We think there is no conflict between the two.
It is well established that where the contract provides, as in this case, for a determination by a board of the compensation to be paid because of changes, the decisions of the board are conclusive, in the absence of fraud or of such gross error as may imply bad faith, amounting to fraud. See Ripley case, 223 U. S. 695,104; Gleason case, 175 U. S. 588; Brinck case, 53 C. Cls. 170,176, and cases there cited. There is a practical admission of this principle in the fact that *100 plaintiff's petition, as finally amended, contains the following belated averment: “The rulings, decisions, and instructions of the Secretary of the Navy and of the Bureau of Construction and Repair and the acts and omissions of the various boards and officers and representatives of the United States, as hereinbefore set forth, constitute and amount to bad faith in the execution of said contract on the part of the United States.” It was appositely said in the Gleason ease, supra: “But even if we pass by the insufficiency of the allegation, we perce.ive no evidence or finding based on evidence which would have sustained a stronger or more adequate allegation. Indeed, no evidence whatever would appear to have been offered to sustain a charge of bad faith or gross mistake equivalent thereto.” The essential averment, though somewhat vaguely made, is unsupported by the evidence. The application of the rule stated removes any necessity for considering whether, in view of the statutory requirement that the contract should provide for a board whose decisions should be final, Congress intended to exclude all review of the board’s action. The plaintiff assails the action of the board and says the Secretary or the board or some of them were guilty of bad faith. The defendant says that the Secretary in granting extensions of time or failing to deduct liquidated damages -exceeded his authority and made a “mistake.” The wide realm of detailed investigation with its attendant uncertainty, and the testimony adduced which two such contentions invite, is apparent from a short history of the case.
The original petition was filed September 10, 1909. Amended petitions, increasing the ad damimtm, have been filed, some amendments being as late as 1921. In October, 1911, the plaintiff filed its bill of particulars, comprising nearly 100 printed pages, in which it classified its claims as based (1) upon insufficient allowances by the board of costs of changes, (2) upon deficiencies of amounts allowed in changes involving increased costs, (3) upon alleged extra work, (4) upon general damage for delays. In the first of these headings appear some 18 separate items, involving claims varying from less than $100 to many hundreds of *101 dollars, and aggregating over $100,000. In the second heading appear many separate items, varying in amounts from a few dollars to many thousands, and aggregating approximately $229,000. In the third heading appear many items aggregating over $106,000, and under the claim for general damages are claims aggregating over $450,000. Substantially all of these items, except probably damages for delay in furnishing armor, had been passed upon by the board of naval officers or by the Secretary of the Navy under one or another of the contract provisions. It does not appear that a ruling of the court was invoked under the provisions of section 165, Judicial Code, which enables it to limit testimony to claims that may be recoverable. The plaintiff has taken testimony upon these items, or most of them, and the defendant has examined many witnesses. A printed record of nearly ten thousand pages has been built up involving-over eighteen hundred pages of briefs.
When the case was ready for trial it was referred to a commissioner for a report of the facts. He gave much time to a study and analysis of the testimony, briefs, and requests for findings, and has made an elaborate report containing many detailed findings, which in turn have been made the subject of numerous exceptions by both of the parties. While an application of the controlling rules of law renders a large part of the commissioner’s work apparently unnecessary, this application following the work did not diminish the extent of it or the care with which he looked into the details of the construction of a battleship. We are asked nearly twenty years after the authorized board has acted to review its action and to substitute for its conclusions those of the court, to be based upon testimony of witnesses given ten years and more after the event, and consisting in large measure of estimates, opinions, and conclusions of the witnesses themselves. Whatever of tribute the record may be to the industry of counsel, it also furnishes a good illustration of the wisdom of the rule just stated. The contract did not contemplate that the opinion of the court should be substituted for that of the board. “In the absence of fraud, or gross mistake implying fraud, his decision (that ,of an engineer) on all these matters was conclusive.” *102 Ripley case, supra. In its statement of the case plaintiff says its claim consists of the following items: (1) Damages by delays due to the United States, (2) insufficient compensation for certain changes made in the work, (3) admitted balance unpaid. The second of these items is controlled by what we have already said — the board’s action is conclusive. The item of damages for delays may be divided into (1) a claim for damages caused by delays resulting from changes in the plan and specifications, and (2) a claim for damages caused by the Government’s failure to supply in proper time armor or things it agreed to furnish. The entire delay, covered by both of these contentions, amounts to 20 months and 8 days. The finding shows that the delay of the Government in supplying the armor and ordnance amounted to 412 days, including Sundays and holidays, or 345 working days.
The contract provides that “all delays that the Secretary shall find to be properly attributable” to the Government should entitle the plaintiff to a corresponding extension of time. The Secretary, granting extensions, recited that the delays were beyond plaintiff’s control, and in one or more of his extensions recognized that the delay was caused by the Government’s failure to supply armor or ordnance. The provision that delays attributable to the Government would entitle the contractor to a corresponding extension of time protects him against the deductions for liquidated damages during such period but does not contemplate immunity to the defendant for delays caused by its failure to observe its own obligations. Changes were authorized, and this implied that they would, or at least might, produce delays. The board’s determination settled any compensation due on this account. It was never contemplated either by the statute or by the contract that delays incident to changes would subject the Government to damage beyond that involved in the changes themselves. The appropriation for the vessel was limited. It had to be constructed, if at all, within definite limits of amount. But the right to make changes was a right expressly contracted for and if the defendant were made liable for consequential and other damages attributable to delays resulting from changes,' *103 the result would be either that the stipulated right to make changes was not effective or that the cost of the vessel might be vastly increased. In the McCord case, 9 C. Cls. 155 (95 U. S. 61), the contract for the construction of a battleship of the monitor type provided that alterations in the plan could be ordered by the Government and if they caused additional expense they would be paid for; if they effected a reduction in cost the price would be correspondingly reduced. This court said: “This privilege of the United States to make alterations on the terms stated being expressly provided for in the contract, the contract price related to that privilege as much as to any other provision in the contract, and therefore it must be taken as included in that price, and paid for in it. And the United States can not be held liable for exercising a privilege they had purchased, but only for abusing it; and the fact is found that they did not abuse it, but made the alterations shown without unreasonable delay. And this has reference, as the parties must have had, to the nature of the undertaking.” In the same case the Supreme Court say: “It is very clear that both parties contemplated the probability that the work would not be completed at the precise period of eight months from the date of the contract. They also contemplated that changes would be made in the construction of the battery. They made such provision for these matters as they deemed necessary for the protection of each party.” An additional day for each day’s delay .thus caused was provided and if this was not satisfactory to the plaintiff the question should have been raised before the contract was signed.
The cases of Moore, Receiver, 46 C. Cls. 139; United Engineering & Contracting Company, 47 C. Cls. 489; and the Freel case, 186 U.S. 309, are not contrary to these conclusions. The Freel case presented the question of a surety’s continued liability when changes were made by the principal and the other party to the contract, not assented to by him. The changes relied upon by the surety to justify his release were held by the court to have introduced substantially new work, “ at an increased expense and gave an increased time for performance.” The familiar rule was applied that *104 changes oí substance in the provisions of the contract, without the surety’s consent, though assented to by his principal, extinguishes the former’s liability, but the principal was not thereby released. See California, Bridge Co. case, 245 U.S. 837; 50 C. Cls. 40. In the other two cases the contract provisions were materially different from those we have to deal with. They did provide that changes could be made in the plans, but before becoming effective as to either party they must have been agreed to in writing by both. In the instant case the Government was given the right to make changes and the question of whether there should be an increase or decrease in the stated compensation was left, by agreement, to the arbitrament of a board.
Since the “ changes ” were specified in supplemental agreements entered into in the Moore case, the Government’s delay complained of was “ in deciding on the changes embodied in the supplemental agreement ” making performance within the stipulated time “impossible.” Similarly, in the Engineering Co. case the Government’s delay “ in making changes and alterations in the work and in the use of the docks for docking vessels ” was the basis for damages. Neither of these cases considered the questions presented by the facts in this case. The ruling in one of them that delay by the Government may relieve the contractor from the imposition of stipulated liquidated damages, or entitle him, where stipulated, to a corresponding extension of time for performance, is not to be confused with the contractor’s claim for damages on account of the Government’s delay. The latter is illustrated by the claim for damages on account of the Government’s delay in furnishing armament. As already said, the contract in very broad terms provided for “ changes,” the plaintiff “ expressly waived ” any claim to extra compensation for extra performance in supplying any “ omission in the drawings, plans, or specifications ” of details or provisions necessary to carry the contract into full effect, according to the intent of the acts of Congress mentioned. All of these stipulations were within the power of the parties to make, and having made them it is too late for the plaintiff, after the changes were ordered and made, to *105 complain that they were more extensive than it thought they would be. See Wells Bros, case, sufra. If contemporaneous construction by a party were necessary to sustain this view, the plaintiff’s letter of November 27, 1905 (Finding IV), may be cited wherein, after quoting a contract provision for changes, it says, “ and you will please note that the contractor by this clause (and the contract in general) surrenders all his rights and throws himself on the mercy of the great United States Government.”
In the Myerle case, 33 C. Cls. 1, which involved a contract for the construction of the ironclad monitor Monadnock, it appeared that the Government caused delays by failure to furnish materials and by changes of plans, and otherwise, and the court passing upon the question of damages said: “We hold that the plaintiff can only recover those items of damage which are the proximate result of the acts of the Government. What those items are is somewhat difficult to determine. For a damage to be direct there must appear no intervening incident (not caused by the defaulting party) to complicate or confuse the certainty of the result between the cause and the damage; the cause must produce the effect inevitably and naturally, not possibly nor even probably * * *. There must not be two steps between cause and damage.” This was the view of the Secretary of the Navy, afterwards Attorney General Bonaparte, whose opinion appears in the findings, and the board fixed compensation accordingly.
The delays caused by the Government’s failure to supply armor and ordnance stand upon a different basis. There is nothing in the contract authorizing or implying these delays. The understanding was that certain things would be furnished as needed. They were not furnished and the Government breached its contract in that regard. It is therefor liable for the damages arising from this breach. See Sanborn’s case, 46 C. Cls. 254.
One of the claims of plaintiff is for what it terms increased capital investment during the period of delay measured by interest. The court is asked to find “(i) extended use of capital investment measured by interest, $106,462.55.” The
*106 commissioner made no finding upon this subject, apparently for the reason that there is no proper basis for it furnished by the evidence. The plaintiff’s principal witness has produced a chart, based manifestly on incorrect theories, and the commissioner has properly enough refused to follow them. The court thinks sufficient reason for such action is found in the conclusion that the item claimed is not recoverable. In the case of Myerle, Executor, sufra, a similar question was presented. The delay, it was said, forced the contractor to borrow money to carry on his contract, and he was as a consequence put to extra expense, measured by interest paid. The court, calling attention to the statute forbidding the allowance of interest unless the contract stipulates for it (sec. 117, Judicial Code, as amended) adds: “The distinction by plaintiff sought to be made is one of terms only, not of substance. If plaintiff had used his own money and so lost the interest which it might have earned for him, the claim would have been as meritorious, but would not have differed from that now made.” We think this reasoning is sound. Calling interest “ damages ” or loss does not deprive it of being interest, and the statute forbids the allowance of interest. It is frequently the case that interest, where not stipulated for, is allowed by the courts as damages for the detention of money or as compensation to which a plaintiff is entitled, but this rule is not applicable to the sovereign, “ and, as has been settled on grounds of public convenience, is not to be awarded against a sovereign government, unless its consent to pay interest has been manifested by an act of its legislature or by a lawful contract of its executive officers.” United States v. North Carolina, 136 U.S. 211, 216. See also Sherman case, 98 U. S. 565; Angarica v. Bayard, 127 U.S. 251, 260.
In accordance with these views, allowances have been made for the additional cost to plaintiff by reason of the Government’s delays in furnishing armor, and other materials, (1) for the proportional part of the plant for the number of working days involved in defendant’s delay, (2) for the maintenance of Government offices and occupation of plant space or berth and wharfage for the entire *107 period of delay, (3) for the cleaning and painting, etc., of the vessel during the period of working days involved, and for the continued insurance and cost of surety bond for the entire period. It seems to the court that these items of insurance and surety bond, Government offices, and occupation of plant space and wharfage, should be paid during the entire period of delay and not merely for the number of working days therein. The insurance and occupation of wharfage or other space was continuous. The other items are limited to the number of working days.
The item of “ plant charges ” presents an unusual situation. Pending the completion of the vessel, plaintiff disposed of its plant and the appurtenances thereto, reserving, however, the space used in the vessel’s construction and certain other essential rights until the work was finished. The question arises whether plaintiff can recover for plant charges during the period following its disposition of the property. The plant belonged to another. We would have no difficulty in finding that the purchaser of the plant could not recover for this item, there being no contract relation between the purchaser and the Government, and for this and other reasons that are apparent the plaintiff can not recover for the purchaser’s use and benefit plant charges following the disposition of the plant. Inasmuch, however, as these plant charges must have fallen on some one and the Government would be liable for them, if there had been no sale, in the same proportion we have held it liable before the sale, it seems reasonable and proper to consider that the reservation of the space and other rights out of the sale probably reduced the compensation which plaintiff would have received for its plant and accessories, freed from the reservations made necessary by the vessel’s condition. A proportion of the plant charges during the period following the sale may be presumed to have fallen on plaintiffs. They did not fall on the defendant, and the mere fact of a sale of the plant in the circumstances stated should not exonerate it from all liability for a charge which it should have met if there had been no sale.' We have accordingly allowed a proportionate plant charge during said period.
*108 A provision of the contract (clause 20) left disputes arising out of the meaning of matters in the drawings or specifications and discrepancies between any of them and the contract to the determination of the Secretary, the plaintiff agreeing to abide by his decisions. Several disputes arose about these things, and claims were made by the plaintiff (see Finding VII). These are not allowed. They were decided by the Secretary who based his several rulings on one or another of the contract provisions and specifications. (1) He held that the specifications provided for the extension of the inner bottom plating. (2) The specifications provided that the contractor should provide appropriate means of raising and lowering the armor hatches “ as approved.” Plaintiff was allowed to use pulley blocks instead of a more expensive gear and this item of claim was disallowed. (3) The wiring was provided for in the specifications as well as by the general practice in vogue. (4) The Secretary ruled that clause two of the contract as well as other provisions required that the contractor shellac the linoleum and that it was always the custom to use shellac on linoleum placed as this was. The contractor at first seemed satisfied with this ruling, but afterwards took the position that it would claim that the shellac was “ extra work.” This contention ignores the express waiver plaintiff had made for any extra compensation for extra performance as well as ignores the Secretary’s ruling. The effort to distinguish between the use of paint and shellac as applied to this particular work can not be sustained. (5) The Secretary under authority of clause 20 held that the specifications called for thermostats and that those furnished were a type in vogue. His action was conclusive. (6) The cutting of bolts and threads ivas held to be required and the plaintiff at first concurred m this ruling. Three years afterwards it sought to renew the claim. The Secretary’s ruling was conclusive. (7) The reference of the claim for $322.40 for providing clearance for the ammunition hoist was based on clauses 2 and 12 under the general authority given by clause 20 of the contract to the Secretary. (8) Anticipating what could and would be done under clause 11, paragraph 3, of the contract in the circumstances the Sec *109 retary required the plaintiff to reinforce certain fittings and it elected to do the work. (9) The Secretary under the general authority conferred on him decided that the type plans of the foundations for the guns were too weak and plaintiff was required to strengthen them, this action being taken under specified clauses of the contract.
The plaintiff claims that the change from a sheathed to an unsheathed vessel entitled it to a large sum. The board on changes determined that the change reduced the compensation. The plaintiff’s original bid was upon a vessel sheathed of about 15,000 tons and unsheathed of about 14,600 tons. The explanation of the absence of exact displacement in the bid is that it had not been exactly calculated when the specifications upon which bids were predicated were presented and furnished the bidders. Before the bids were opened, however, the exact displacement had been calculated and was at plaintiff’s disposal. The statement of the displacement at “ about ” so many tons is of relatively small importance since the specifications had to be and were changed materially in order to bring plaintiff’s bid within the limit of appropriation. Plaintiff’s bid was less per ton for an unsheathed than for a sheathed vessel. It contracted for a sheathed vessel of about 15,000 tons. It built an unsheathed vessel of 14,948 tons, and this was the tonnage as accurately figured before the bids were opened. The theory upon which plaintiff’s claim is based as well as the testimony supposed to sustain it is vague and uncertain. The decision of the board, however, is conclusive.
The item for constructing 50 rifle racks is not allowable. The whole number necessary was 340 and those furnished by the Government were used. It does not appear that any of plaintiff’s racks were used. Presuming that it would have to make these racks, plaintiff submitted its drawings to the superintending contractor. These were approved by the Bureau of Construction and Bepair. When later it was decided that the Government would furnish the racks the effect was to relieve plaintiff of constructing approximately 300 racks more and thus saving it at the price it claims for 50, about $9,800. The item for “ whistles'’ is not allowed. The facts relative to it appear in Finding X.
*110 The defendant asserts a counterclaim in the sum of $229,800 for liquidated damages on account of 396 days alleged delays. The ninth section of the contract provides that if the completion of the vessel be delayed beyond the time fixed for its completion deduction should be made from the price stipulated for each day of delay in a specific amount, provided, however, that such delay “ shall not have been caused by the act of party of the second part, or by fire or water, or by any strike or standout of workmen. * * *
or by other circumstances beyond the control of the ” plaintiff. It is also provided that in case any question shall arise “ concerning-deductions from the price of the vessel * * *
such question, with all the facts relating thereto, shall bo submitted to the Secretary of the Navy for consideration, and his decision thereon shall be conclusive and binding upon the parties to this contract.”
The plaintiff’s suit was brought in September, 1909. It was not until June, 1915, that the counterclaim was filed. The question of delays had been repeatedly before the Secretary before the vessel was completed. On September 11, 1905, he granted an extension of eighteen months and sixteen days “ on account of delays caused by strikes ” at plaintiff’s shipyard. This extension carried the period for completion to September 23, 1905, and his order recited: “ It being understood that this extension is to cover all delays from any cause whatever occurring prior to September 1, 1905.” There were four other extensions at different times, in each of which the Secretary stated that the extension was because of “ circumstances beyond the contractor’s control,” within the meaning of the contract. When the vessel was finally completed and the time for settlement arrived there was found to be due the contractors a balance o'f $T0,000. No charge was made against plaintiff for liquidated damages — no deduction whatever was made from the contract price on that account. This was properly treated as settled by the Secretary’s extensions of time. Evidently his action was deemed conclusive.
Urging the. finality of the findings of the board as to the compensation in the matters of changes, the defendant seeks to avoid the apparent inconsistency of its position with re *111 gard to the Secretary’s extensions of time, by invoking the principle that the Government can not be bound by the mistake of an officer, citing cases on that point. (Wisconsin Central By. Co. case, 164 U. S. 190, and others.) It is argued that the extensions and failure to deduct for liquidated damages were in excess of the authority conferred on •the Secretary and that a mistake was made by him in “ assuming to grant such extension.” The language of the contract conferring power on the Secretary in this regard is very plain and manifestly was intended to obviate such a contention as that now made. See Gleason case, 175 U.S. 588, 604; Cramp case, 41 C. Cls. 164, 189. He granted extensions because of strikes, because of the Government’s failure to supply armor, and because of circumstances beyond the contractor’s control. The plaintiff’s brief correctly states that “ the Supreme Court and this court have repeatedly decided that the act of an officer of the United States in accordance with authority given him by a contract is binding upon both parties and is not subject to judicial review,” citing the Kihlberg case, 97 U.S. 398, and Gleason case, supra. And it may be added that the principle thus stated is as applicable to the authority of the board which fixed compensation for changes as it is to that of th'e Secretary in authorizing extensions.
The plaintiff is entitled to judgment for the items mentioned in Findings XII and XIII amounting to $118,036.38; and as to other items claimed the petition should be dismissed and the defendant’s counterclaim should also, be dismissed.
And it is so ordered.
Hay, Judge; Downey, Judge; and Booth, Judge, concur.
Geaham, Judge,
took no part in the decision of this case.
APPENDIX A
Navy Department, Washington, October 3, 1905. Decision. — By the contract dated May 17, 1905, between the United States and the Fore River Shipbuilding Com.pany for the construction of a scout cruiser, it is provided *112 that “doubts or disputes” arising respecting the rights of the parties as determined by the contract shall be referred to the Secretary of the Navy for decision, his determination to be binding. In accordance with this provision the Fore River Shipbuilding Company has requested the Secretary to determine whether the said company will be entitled to compensation for such delays as may be caused (if any shall be caused) in the construction of the said cruiser by changes in the specifications made by the Navy Department, and also to determine what elements of damage would properly enter into the computation of compensation for such delays. It appears to the Secretary of the Navy that these questions are of great importance, but not of much difficulty.
The rights of the parties depend entirely upon the contract, including, of course, as parts of that contract the various other papers made such by reference. In interpreting the contract, however, due weight must be given to well-known facts affecting the subject matter and which may be reasonably presumed to have been present in the minds of the parties when they entered into it. One fact of great importance and to which exceptional prominence has been given in the history of naval architecture during the past 20 years is that changes in the views of authorized experts respecting the merits of vessels of war occur very frequently and at very short intervals, partly by reason of new scientific discoveries and inventions and partly by reason of the lessons of experience occurring in those intervals. It is a notorious fact, of which the Fore River Shipbuilding Company and also the Government unquestionably had notice when they signed this contract, that changes in the plans and specifications might be reasonably expected to be made, and it was therefore incumbent upon the company as well as upon the Government to stipulate distinctly and clearly in the contract what effect upon the rights and responsibilities of the parties would be produced by such changes. There is, in fact, in the second clause of the contract the following provision:
“ * * * And it is hereby further provided, and this contract is upon the express condition, that the drawings, plans, and specifications aforesaid may be changed, and that such alterations as are not contrary to law may be made in this contract by the party of the second part, but no such changes shall be made when the cost thereof shall, in the execution of the work, exceed five hundred dollars ($500), except upon the written order of the Secretary or Acting Secretary of the Navy; that if changes are thus made, the actual cost thereof, and the damage, if any, caused thereby, shall be *113 ascertained, estimated, and determined by a board of naval officers appointed by the Secretary of the Navy, and that the' party of the first part shall be bound by the determination of said board, or a majority thereof, as to the amount of increased or diminished compensation the said party of the' first part shall be entitled to receive, if any, in consequence-of such change or changes.”
So far' as the Secretary is informed, this is the only provision relating to changes and their consequences, except the-following:
“All delays that the Secretary of the Navy shall find to be-properly attributable to the party of the second part, or to its authorized officers or agents, and to have been delays, operating upon the completion of the vessel within the time specified therefor in this contract, shall entitle the party of the first part to a corresponding extension of the period prescribed for the completion of the vessel.”
It will thus be seen that the contract provides for the determination, in a specified way, of the “ actual cost ” of changes and “the damage, if any, caused thereby.” The word “damage” is evidently here intended to be taken in its accurate and technical meaning, as determined by the well-settled jurisprudence of this country with respect to the law of damages. It is a well-settled principle of law that, in the absence of any special provision to the contrary, the damage-caused by anything must be its direct and immediate consequence and not the result of any intermediate causes, which may have been themselves due to the act or omission on which the claim for compensation is founded. If it had been intended that the Word should be interpreted in a different sense in this passage, it would have been very easytlto have inserted a clause to that effect.
The claim of the contractor in this case is, stated very briefly, that if changes be made, or suggested as likely to be-made, by the department, and this fact leads it to delay the work on the vessel, so as to avoid the duplication of labor if the change shall be actually made, then all the consequences of such delays are to be construed a part of the “ damage ” to which it will be entitled. It seems to me very clear that this contention can not be sustained. The contract says nothing of delay as a cause of damage or as furnishing a foundation for a claim to compensation. It says distinctly that delays caused by changes shall not be charged against the contractor in estimating the period prescribed for the completion of the vessel. If it had been the intention of the parties that these delays should have *114 any other legal consequence, the contract would undoubtedly have said so. Not having said so, it must be conclusively presumed that they did not mean so.
I should have reached the foregoing conclusion had there been nothing in the contract or in the circumstances under which it was made which, independently of the language used, would render a diiferent conclusion inadmissible, but there is one circumstance which seems to me quite decisive as to the question.
By the first clause of the contract the contractor agrees to •construct the vessel in question in accordance with the provisions of the acts of Congress relating thereto, and in the second clause it is provided that—
“ No omission in the drawings, plans or specification of any detail, object, or provision necessary to carry this contract into full and complete effect, in accordance with the object and intent of the acts of Congress above referred to, shall operate to the disadvantage of the party of the second part, but the same shall be satisfactorily supplied, performed, and observed by the party of the first part, and all ■claims for extra compensation by reason of, or for, or on account of, such extra performance, are hereby, and in consideration of the premises, expressly waived.”
Now, the acts of Congress in question provide a limit to the cost of this vessel. It was made abundantly clear by the oral discussion before the Secretary that, if the construction •contended for by the contractor should be placed upon this contract, not only might the cost far exceed the limit fixed by Congress, but it would be altogetherpmpossible to determine, even approximately, the cost at'the time when the contract was made. One of two consequences would necessarily follow. Either no changes could be made by the Government in the plans and specification for this vessel, or •else the limitation upon its cost would be altogether inoperative. Either of these two constructions, however, would •directly contradict the language of the contract itself.
I rule, therefore, that the contractor will not be entitled to compensation for delays in its work arising from changes in the plans and specifications. It will be entitled to compensation for “damage” caused directly by the change; that is to say, for the additional expense beyond the actual cost •of the change itself involved in the fact that it is a change •and thus may render some portion of the work and materials •already furnished useless. It will be entitled to such compensation, however, onty for changes actually decided upon and not for possible changes suggested or discussed. It is *115 unnecessary for me to determine what would be proper limits of compensation for damage caused by delay, if the -contractor were entitled to such compensation, as that would .be a mere moot question.
Very respectfully,
CHARLES J. BONAPARTE.