The UNITED STATES of America, Appellant,

v.

MESCALERO APACHE TRIBE et al., Appellee.

The UNITED STATES of America, Appellant,

v.

The SHOSHONE–BANNOCK TRIBES OF the FORT HALL RESERVATION, IDAHO, Appellee.

The UNITED STATES of America, Appellant,

v.

TE–MOAK BANDS OF WESTERN SHOSHONE INDIANS OF NEVADA et al., Appellee-Cross-Appellant.

Appeal Nos. 2–74, 10–74 and 12–74.

United States Court of Claims.

July 11, 1975.

---

A. Donald Mileur, Washington, D.C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for appellant. Richard L. Beal, U. S. Dept. of Justice, Washington, D.C., for appellant in No. 2–74.

Craig A. Decker, Washington, D.C., atty. for appellant in Nos. 10–74 and 12–74.

I. S. Weissbrodt, Washington, D.C., atty. of record for appellee, Mescalero Apache Tribe. Weissbrodt & Weissbrodt, Richmond F. Allan and Howard L. Sribnick, Washington, D.C., of counsel.

Pierre J. LaForce, Washington, D.C., for appellees The Shoshone-Bannock Tribes and Te-Moak Bands of Western Shoshone Indians. Frances L. Horn, Washington, D.C., atty. of record. Wilkinson, Cragun & Barker and Robin A. Friedman, Washington, D.C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

## ON APPEAL FROM THE INDIAN CLAIMS COMMISSION

SKELTON, Judge.

This is an appeal by the Government from orders of the Indian Claims Commission (Commission) in three Indian accounting cases (consolidated for this appeal) in which the Commission awarded simple and compound interest from 1883 to 1930 against the Government on trust funds it held for the three appellee Indian Tribes, notwithstanding the provisions of 28 U.S.C. § 2516(a) (1970) and the well established rule set forth in many decisions of the Supreme Court and of this court and other courts that in noneminent domain cases interest on a claim against the United States can be allowed *only* under a contract, treaty, or an Act of Congress *expressly* providing for the payment of interest. The orders of the Commission awarding interest cannot stand, and we reverse.

One of the Indian Tribes, the Te-Moak Bands of Western Shoshone Indians of Nevada (Te-Moaks), filed a cross-appeal from an order of the Commission denying it interest on shortages in the payments due it by the Government under the Western Shoshone Treaty of October 1, 1863, 18 Stat. 689. The Commission held that these shortages were never paid and were never set up as trust funds and could not bear interest as they never in fact existed. We think the order of the Commission in this regard was correct and we affirm. A discussion of the law and the facts follows.

The Government appealed from the following orders of the Commission:

(1) The order of October 4, 1973, 31 Ind.Cl.Comm. 427, 557, and 559, Te-Moak Bands of Western Shoshone Indians of Nevada, Docket No. 326–A (Appeal No. 12–74) and Mescalero Apache Tribe (Mescalero Apaches), Docket No. 22–G (Appeal No. 2–74) holding that the United States is liable for simple interest and compound interest on the fund known as "Indian Moneys, Proceeds of Labor" (I.M.P.L. Funds),[1] from 1883 to 1930.

(2) The order of January 16, 1974 (unreported), holding that the above order of October 4, 1973, was the law of the case in Shoshone-Bannock Tribes of the Fort Hall Reservation (Shoshone-Bannocks), Docket No. 326–C (Appeal No. 10–74).

The Te-Moaks cross-appealed as to that part of the above order of October 4, 1973, that denied them interest on the unpaid shortages of treaty funds mentioned above. They also cross-appealed from the Commission's order of April 4, 1974, 33 Ind.Cl.Comm. 417, 435 denying their motion for rehearing on the decision of October 4, 1973, above.

By way of background, it should be pointed out that prior to 1883 the I.M.P.L. Funds were not extensive and were held by local Government agents. These agents disbursed these funds from time to time to meet the needs of the Indians. Such expenditures were usually made after consultation with the Indians and with their approval. However, by 1883 the I.M.P.L. Funds had begun to increase in amount and it was decided that they should be taken from the local agents and deposited in the U.S. Treasury for the benefit of the Indians. The Act of March 3, 1883, ch. 141, 22 Stat. 590 was the result. It reads in pertinent part as follows:

> The proceeds of all pasturage and sales of timber, coal, or other product of any Indian reservation, except those of the five civilized tribes, and not the result of the labor of any member of such tribe, shall be covered into the Treasury for the benefit of such tribe under such regulations as the Secretary of the Interior shall prescribe; and the Secretary shall report his action in detail to Congress at its next session.

Significantly, the Act makes no mention of a duty to invest such proceeds or to pay interest thereon. To the contrary, it expressly provides that the proceeds "shall be covered [deposited] into the Treasury for the benefit of such tribe under such regulations as the Secretary of Interior shall prescribe."

Pursuant to the 1883 Act, the I.M.P.L. Funds were deposited in the Treasury for the first time in one common fund for all of the Indians. But due to a technicality in the Act, the Secretary of the Treasury would not allow the Secretary of the Interior to withdraw any of these funds without an appropriation by Congress. This proved to be a cumbersome arrangement because the money was needed from time to time to meet the needs of the Indians. As a consequence, the Act was amended by the Act of March 2, 1887, ch. 320, 24 Stat. 463 which provided in pertinent part as follows:

> That the Secretary of the Interior is hereby authorized to use the money which has been or may hereafter be covered into the Treasury under the provisions of the act approved March third, eighteen hundred and eighty-three, and which is carried on the books of that Department under the caption of "Indian moneys, proceeds of labor," for the benefit of the several tribes on whose account said money was covered in, in such way and for such purposes as in his discretion he may think best, and shall make annually a detailed report thereof to Congress.

This 1887 amendment gave the Secretary of the Interior the authority to

---

1. This fund was composed of miscellaneous receipts from Indian reservations derived from such sources as sales of grazing leases, oil and gas leases, timber, coal and other natural resources. They were deposited in the Treasury pursuant to the Act of March 3, 1883, 22 Stat. 590, as amended, 25 U.S.C. § 155 (1970).

use the I.M.P.L. Funds in his discretion for the benefit of the Indians without an appropriation by Congress. It is significant that the 1887 amendment, like the Act of 1883, did not provide for the payment of interest on I.M.P.L. Funds. Actually, these funds were transient in character because they were paid out from time to time to provide for the needs of the Indians. Obviously, funds of this character did not lend themselves to investment purposes to earn interest because they were not available for a sufficient length of time to allow them to be used to purchase stocks or bonds or other securities that would earn interest only after a long period of time. It is clear that Congress did not intend to pay interest on these funds nor to require them to be invested in interest bearing stocks, bonds, or other securities. The existing facts mentioned above militate against any such intention, and clearly the Acts of 1883 and 1887 did not require the Government to pay interest on these funds nor that they be made productive otherwise.

The statute controlling I.M.P.L. Funds was amended again by the Act of May 17, 1926, ch. 309, 44 Stat. 560 and provided in pertinent part as follows:

> * * * That hereafter all miscellaneous revenues derived from Indian reservations, agencies, and schools, which are not required by existing law to be otherwise disposed of, shall be covered into the Treasury of the United States under the caption "Indian moneys, proceeds of labor," and are hereby made available for expenditure, in the discretion of the Secretary of the Interior, for the benefit of the Indian tribes, agencies, and schools on whose behalf they are collected, subject, however, to the limitations as to tribal funds, imposed by section 27 of the Act of May 18, 1916 (Thirty-ninth Statutes at Large, page 159).

This amendment, like the Acts of 1883 and 1887 did not provide for the payment of interest on I.M.P.L. Funds. By this time it was clear that Congress knew that no interest was being paid on these funds and that they were not otherwise productive, and that Congress approved of this manner of handling I.M.P.L. Funds. This knowledge of Congress and its approval of the administrative interpretation of the I.M.P.L. statutes as not to require payment of interest by the Government on I.M.P.L. Funds or make them otherwise productive is forcefully shown in the records of this case by the reports to Congress by the Commissioner of Indian Affairs for 1904 and 1905 which stated that Indian funds were divided into two categories, namely, (1) "Trust Funds and Trust Lands" and (2) "Income of Indian Tribes." Under the trust funds classification were listed all the funds *required to be productive* as a trust fund held by the Government by an act, resolution or treaty. Such funds bore interest and the principal amounts and the interest earned were shown together with the appropriate congressional authority for each tribe for each year. The second classification "Incomes of Indian Tribes" consisted of four sub-classifications, namely, (1) "Interest on trust fund," (2) "Treaty and agreement obligations," (3) "Gratuities," and (4) "Indian moneys, proceeds of labor and miscellaneous (I.M.P.L. Funds)." It was obviously clear to Congress that no interest was being paid on I.M.P.L. Funds and that Congress approved of this manner of handling these funds.

This brings us to 1929 when the Secretary of the Interior recommended to Congress that the noninterest bearing I.M.P.L. Funds held by the Government for Indians be made interest bearing funds. It is significant that he stated in his recommendation:

> It is conceded that there is no legal obligation to pay interest on these funds * * *.

The Congress responded by enacting the Act of February 12, 1929, ch. 178, 45 Stat. 1164, which provided in pertinent part:

> * * * That all money in excess of $500 held by the United States in a trust fund account, and carried on the

books of the Treasury Department to the credit of an Indian tribe, if the payment of interest thereon is not otherwise authorized by law, shall bear simple interest at the rate of 4 per centum per annum from the date of the passage of this Act. * * *

Although it appears that the Secretary of Interior had intended that I.M.P.L. Funds would be included in the 1929 legislation, the Comptroller General ruled on May 31, 1929, that it did not because the I.M.P.L. Fund was not "carried on the books of the Treasury Department to the credit of an Indian Tribe." Decision A–27308, 8 Comp.Gen. 625.

Because of this technicality, the Secretary of the Interior requested additional legislation that would make I.M.P.L. Funds interest bearing. The Congress responded by enacting the Act of June 13, 1930, ch. 483, § 2, 46 Stat. 584, that provided in pertinent part as follows:

Sec. 2. All tribal funds arising under the Act of March 3, 1883 (22 Stat. 590), as amended by the Act of May 17, 1926 (44 Stat. 560), now included in the fund 'Indian Money, Proceeds of Labor,' shall, on and after July 1, 1930, be carried on the books of the Treasury Department in separate accounts for the respective tribes, and all such funds with account balances exceeding $500 shall bear simple interest at the rate of 4 per centum per annum from July 1, 1930.

The record from 1883 to 1929–30 is unequivocal. The Executive Branch understood that it possessed no authority to pay interest on I.M.P.L. Funds. Congress not only concurred in this construction, but, in each of its Acts directly involving I.M.P.L. legislation (Acts of 1883, 1887, and 1926), conspicuously omitted any provision for the payment of interest. Under the well established rule against interest, each of these omissions was an unequivocal declaration by Congress that no interest thereon was intended.

With this background, the record shows in these accounting cases that in the Te-Moak case, Docket No. 326–A, the Government filed its accounting report showing that $314,241.19 was deposited in its I.M.P.L. account between 1899 and 1951, and that no interest was paid on the fund until June 30, 1930, after which date interest was paid pursuant to the Act of June 13, 1930, at the rate of four percent per annum.

In Shoshone-Bannock, Docket No. 326–C the accounting report of the Government showed that $380,628.76 was deposited in its I.M.P.L. account between 1887 and 1951, and that no interest was paid on the account prior to June 30, 1930, after which date interest was paid pursuant to the Act of June 13, 1930, at the rate of four percent per annum.

In Mescalero Apache, Docket No. 22–G, the accounting report of the Government showed that $1,670,620.38 was deposited in the I.M.P.L. account between 1887 and 1950, and that no interest was paid on this account until June 30, 1930, after which interest was paid pursuant to the Act of June 13, 1930, at the rate of four percent per annum.

In these accounting cases, which were filed under the Indian Claims Commission Act of August 13, 1946 (25 U.S.C. § 70a (1970), 60 Stat. 1050), the Indians claimed simple and compound interest on the above I.M.P.L. Funds from 1883 when they were first deposited in the Treasury to 1930 when the Congress directed for the first time in the Act of 1930 that interest be paid thenceforth at the rate of four percent per annum. The Commission allowed the claim and awarded the Indians simple and compound interest against the United States for the period stated. The legality of this award is before us for determination.

It is obvious that the award is in direct conflict with 28 U.S.C. § 2516(a) (1970), which provides as follows:

§ 2516. Interest on claims and judgments.

(a) Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims *only* under a contract or Act of Congress

*expressly providing for payment thereof.* [Emphasis supplied.]

The awards of interest is also in conflict with many decisions of the Supreme Court and of this court that interest may not be allowed on a claim against the United States in noncondemnation cases unless there is a contract or a statute expressly providing for the payment of interest. These cases will be discussed below.

■ It is fundamental that the Government has sovereign immunity from suit except where Congress has by legislation expressly waived such immunity. This principle applies to claims for interest against the United States. *See Ute Indians v. United States,* 45 Ct.Cl. 440, 470 (1910); *United States v. North Carolina,* 136 U.S. 211, 10 S.Ct. 920, 34 L.Ed. 336 (1890); *United States v. Sherman,* 98 U.S. 565, 25 L.Ed. 235 (1878); *United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 260, 8 S.Ct. 1156, 32 L.Ed. 159 (1888); *United States v. N. Y. Rayon Importing Co.,* 329 U.S. 654, 658–59, 67 S.Ct. 601, 91 L.Ed. 577 (1947); and *Smyth v. United States,* 302 U.S. 329, 58 S.Ct. 248, 82 L.Ed. 294 (1937).

The rule of sovereign immunity from suit against the Government without its consent is firmly established in our judicial system. The following cases are of interest in this regard:

In *Nassau Smelting & Refining Works v. United States,* 266 U.S. 101, 45 S.Ct. 25, 69 L.Ed. 190 (1924), the Supreme Court held:

> * * * The objection to a suit against the United States is fundamental, whether it be in the form of an original action, or a set-off, or a counterclaim. Jurisdiction in either case does not exist, unless there is *specific congressional authority* for it. * * * [*Id.* at 106, 45 S.Ct. at 25] [Emphasis supplied.]

Again, in *United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941), the Supreme Court said:

> The United States, as sovereign, is immune from suit save as it consents to be sued, *United States v. Thompson,* 98 U.S. 486, 25 L.Ed. 194; *United States v. Lee,* 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171; *Kansas v. United States,* 204 U.S. 331, 27 S.Ct. 388, 51 L.Ed. 510; *Minnesota v. United States,* 305 U.S. 382, 387, 59 S.Ct. 292, 294, 83 L.Ed. 235; *Keifer & Keifer v. Reconstruction Finance Corp.,* 306 U.S. 381, 388, 59 S.Ct. 516, 517, 83 L.Ed. 784; *United States v. Shaw,* 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888. See cases cited in *The Pesaro,* D.C.N.Y., 277 F. 473, 474, *et seq.,* and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. *Minnesota v. United States, supra,* 305 U.S. 388, 59 S.Ct. 292, 83 L.Ed. 235 and cases cited; cf. *Stanley v. Schwalby,* 162 U.S. 255, 270, 16 S.Ct. 754, 760, 40 L.Ed. 960. * * * [*Id.* at 586–87, 61 S.Ct. at 770.]

Many cases have held that the waiver of sovereign immunity cannot be implied but must be unequivocally expressed. In *General Mut. Ins. Co. v. United States,* 119 F.Supp. 352 (N.D.N.Y.1953), the court said:

> It is beyond argument that the United States may be sued only where its immunity has been specifically waived by statute, and that *such waiver may not be implied in the construction of an ambiguous statute.* [Emphasis supplied.] [*Id.* at 354.]

In *Leyerly v. United States,* 162 F.2d 79 (10th Cir. 1947), the court held:

> *The government does not consent to be sued by implication,* and consent to be sued should not be extended beyond the plain terms of the authorizing statute. *Price v. United States and Osage Indians,* 174 U.S. 373, 19 S.Ct. 765, 43 L.Ed. 1011; *Eastern Transportation Co. v. United States,* 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472; * *. [Emphasis supplied.] [*Id.* at 84.]

In the case of *North Dakota-Montana Wheat Growers' Ass'n v. United States,* 66 F.2d 573 (8th Cir. 1933), *cert. denied,* 291 U.S. 672, 54 S.Ct. 457, 78 L.Ed. 1061 (1934) the court said:

It is fundamental that the United States cannot be sued without its permission, and that permission must be specifically granted by Congress. *It will not be implied.* It is a deep-rooted principle in the fabric of all English speaking countries that a sovereign is immune from suits in its own courts. In *Nassau Smelting & Refining Works, Ltd. v. United States,* 266 U.S. 101, 106, 45 S.Ct. 25, 69 L.Ed. 190, the court said: "The objection to a suit against the United States is fundamental, whether it be in the form of an original action, or a setoff, or a counterclaim. Jurisdiction in either case does not exist, unless there is specific congressional authority for it. * * * " [Emphasis supplied.] [*Id.* at 577.]

In *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969), the Supreme Court said:

* * * [J]urisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and that *such a waiver cannot be implied but must be unequivocally expressed. United States v. Sherwood,* 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 [Emphasis supplied.] [*Id.* at 4, 89 S.Ct. at 1503.]

■ These decisions are especially applicable to the case before us, because here there was no contract nor statute expressly providing for the payment of interest on the I.M.P.L. Funds of the Indians. Furthermore, there was no Act of Congress that specifically and unequivocally waived the sovereign immunity of the Government to suit for interest on I.M.P.L. Funds by the Indians. It follows, therefore, that the Commission was without jurisdiction or authority to award the Indians interest against the United States in this case.

The allowance of interest by the Commission is directly contrary to the many court decisions that hold that interest cannot be awarded against the Government in the absence of a contract or a statute expressly providing for interest.

We will now consider some of those cases.

In the early case of *United States ex rel. Angarica v. Bayard, supra,* the Supreme Court announced the correct rule as to the allowance of interest against the United States, which is the law at the present time as follows:

The case, therefore, falls within the well-settled principle, that the United States are not liable to pay interest on claims against them, in the absence of express statutory provision to that effect. It has been established, as a general rule, in the practice of the government, that interest is not allowed on claims against it, whether such claims originate in contract or in tort, and whether they arise in the ordinary business of administration or under private acts of relief, passed by congress on special application. The only recognized exceptions are where the government stipulates to pay interest and where interest is given expressly by an act of congress, either by the name of interest or by that of damages.

This appears from a succession of the opinions of the attorney general of the United States, given by Attorneys General Wirt, Crittenden, Legaré Nelson, Johnson, Cushing, and Black, and appearing in the following volumes and pages of those opinions, as published: 1, 268; 1, 550; 1, 554; 3, 635; 4, 14; 4, 136; 4, 286; 5, 105; 7, 523; 9, 57; and 9, 449.

Not only is this the general principle and settled rule of the executive department of the government, but it has been the rule of the legislative department, because congress, though well knowing the rule observed at the treasury, and frequently invited to change it, has refused to pass any general law for the allowance and payment of interest on claims against the government. Such statutes for the payment of interest as have been passed, apply to specific cases enumerated in the several statutes, and do not cover the present case.

The principle above stated is recognized by this court. In *Tillson v. United States,* 100 U.S. 43, 47, 25 L.Ed. 543, this court, speaking of the rule that interest is recoverable between citizens if a payment of money is unreasonably delayed, says that with the government the rule is different, and that the practice has long prevailed in the departments of not allowing interest on claims presented, except it is in some way specially provided for. See also *Gordon v. United States,* 7 Wall. 188, 19 L.Ed. 35, and *Harvey v. United States,* 113 U.S. 243, 248, 249, 5 S.Ct. 465, 28 L.Ed. 987. [*Id.* 127 U.S. at 260, 8 S.Ct. at 1161.]

The rule against allowing interest was stated again by the Supreme Court in *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521 (1947) as follows:

The pertinent part of § 177(a) of the Judicial Code provides that "No interest shall be allowed on any claim up to the time of the rendition of judgment by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest, * * *" Section 177(a) thus embodies the traditional rule that interest cannot be recovered against the United States upon unpaid accounts or claims in the absence of an express provision to the contrary in a relevant statute or contract. *Tillson v. United States,* 100 U.S. 43, 47, 25 L.Ed. 543; *United States v. North American Co.,* 253 U.S. 330, 336, 40 S.Ct. 518, 521, 64 L.Ed. 935; *United States v. Goltra,* 312 U.S. 203, 207, 61 S.Ct. 487, 490, 85 L.Ed. 776. * * *

* * * The sole issue thus becomes whether there is any express provision in the Act or in the lease permitting the recovery of interest under the circumstances. Only if there is such a provision can respondent avoid the traditional rule set forth in § 177(a).

*     *     *     *     *     *

But in order to override the historical rule codified in § 177(a), something more is necessary than an equivocal use of the term "just compensation." It is not enough that the term might be construed to include the payment of interest. As § 177(a) itself indicates, there must be a provision in the contract "expressly stipulating for the payment of interest." That provision must be affirmative, clear-cut, unambiguous; and an unexpressed intention by the parties that the term "just compensation" be construed to include interest is insufficient. *Likewise, where a statute is relied upon to overcome the force of § 177(a), the intention of Congress to permit the recovery of interest must be expressly and specifically set forth in the statute.* Tillson v. United States, supra, 100 U.S. at page 46, 25 L.Ed. 543; United States ex rel. Angarica v. Bayard, 127 U.S. 251, 260, 8 S.Ct. 1156, 1160, 32 L.Ed. 159. Mere use of the term "just compensation," without more, is no substitute for an express provision for interest.

Here neither the Act of March 30, 1920, nor the lease under which respondent operated contains an express provision for the payment of interest, either in addition to or as a part of the "just compensation" to be paid to respondent. If the United States had desired to provide by statute or to contract in the lease for the payment of interest, it would have been easy to have said so in express terms. Because it did not say so, we are led irresistibly to the conclusion that it did not intend to negative the effect of § 177(a) in this instance. *Tillson v. United States, supra.* [Footnote omitted.] [Emphasis supplied.] [*Id.* at 588–590, 67 S.Ct. at 401.]

Again in *United States v. N. Y. Rayon Importing Co.,* 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577 (1947), the Supreme Court held:

In our opinion, § 177(a) of the Judicial Code prohibits the award of any interest under the circumstances of

this case. Section 177(a) provides that "No interest shall be allowed on any claim up to the time of the rendition of judgment by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest, * * *" As we recently pointed out in *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 67 S.Ct. 398 [91 L.Ed. 521], this provision codifies the traditional rule regarding the immunity of the United States from liability for interest on unpaid accounts or claims. In other words, in the absence of constitutional requirements, interest can be recovered against the United States only if express consent to such a recovery has been given by Congress. And Congress has indicated in § 177(a) that its consent can take only two forms: (1) *a specific provision for the payment of interest in a statute* ; (2) an express stipulation for the payment of interest in a contract duly entered into by agents of the United States. Thus, *there can be no consent by implication or by use of ambiguous language.* Nor can an intent on the part of the framers of a statute or contract to permit the recovery of interest suffice where the intent is not translated into affirmative statutory or contractual terms. *The consent necessary to waive the traditional immunity must be express, and it must be strictly construed.* Tillson v. United States, 100 U.S. 43, 25 L.Ed. 543; *United States v. Thayer-West Point Hotel Co., supra.*

Tested by those standards, the award of interest in this case cannot be sustained. There is obviously no contractual stipulation involved. And the appropriation statutes which cover the refunds here in issue contain no provision whatever for the recovery of interest. Act of May 14, 1937, 50 Stat. 137, 142; Act of June 25, 1938, 52 Stat. 1114, 1149. The traditional immunity of the United States, as codified in § 177(a), accordingly applies.

The Court of Claims, without making a reference to § 177(a), sought to justify its award of interest on what it thought "would be right or just." * * *

* * * * * *

But assuming that the equities of the situation all favor the owners of the refund claims, the Court of Claims did not thereby acquire power to carve out an implied exception to the plain words of § 177(a). Had Congress desired to permit the recovery of interest in situations where the Court of Claims felt it just or equitable, it could have so provided. The absence of such a provision is conclusive evidence that the court lacks any power of that nature. Indeed, any other conclusion would permit the Court of Claims to supply the consent which only Congress can give to the imposition of interest against the United States.

* * * Only Congress can take the necessary steps to waive the immunity of the United States from liability for interest on unpaid claims. Cf. *Smyth v. United States,* 302 U.S. 329, 353, 58 S.Ct. 248, 252, 82 L.Ed. 294, 114 A.L.R. 807.

* * * It is enough to note that the traditional rule embodied in § 177(a) is a complete one covering all types of claims, including those arising out of pre-existing judgments. As we have seen, any exception to that rule must be grounded upon *an express provision in a statute or contract.* It follows that any exception relating to pre-existing judgments must be traced to *specific language in a contract or some other statute.* Section 177(a) by itself warrants no such exception. * * *

* * * * * *

* * * Courts lack the power to award interest against the United States on the basis of what they think is or is not sound policy. We reiterate that *only express language in a statute or contract can justify the imposition of such interest.* Such language is absent in this instance.

We accordingly reverse the judgment of the Court of Claims in No. 94

to the extent that it includes an award of interest. * * * [Emphasis supplied.] [*Id.* bridging pages 658–63, 67 S.Ct. at page 603.]

In the case of *Albrecht v. United States,* 329 U.S. 599, 67 S.Ct. 606, 91 L.Ed. 532 (1947), the Supreme Court said:

Turning now to the right to interest under the contracts, and apart from the contention regarding the Fifth Amendment, we find that the contracts have no provision for payment of interest. No statute authorizes the payment of interest in cases like this. *In the absence of specific contract or statutory provisions no interest runs against the Government* even though the Government's payment for the contract purchases be delayed. See *Smyth v. United States,* 302 U.S. 329, 353, 58 S.Ct. 248, 252, 82 L.Ed. 294, 114 A.L.R. 807; *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 588, 67 S.Ct. 398, 399 [91 L.Ed. 521]; *United States v. N. Y. Rayon Importing Co.,* 329 U.S. 654, 659–660, 67 S.Ct. 601, 604 [91 L.Ed. 577]. [Emphasis supplied.] [*Id.* at 605, 67 S.Ct. at 609.]

The Supreme Court held in *United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738 (1951):

* * * We granted certiorari limited to the question presented by the award of interest. 340 U.S. 873, 71 S.Ct. 121 [95 L.Ed. 635] (1950).

It is the "traditional rule" that *interest* on claims against the United States *cannot be recovered in the absence of an express provision to the contrary in the relevant statute or contract.* 28 U.S.C. (Supp. III) § 2516(a). *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 588, 67 S.Ct. 398, 399, 91 L.Ed. 521 (1947), and cases cited therein. * * [Emphasis supplied.] [*Id.* at 49, 71 S.Ct. at 552.]

In the case of *Ramsey v. United States,* 101 F.Supp. 353, 121 Ct.Cl. 426 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952), we held:

However, the common law rule that delay or default in payment of money gives rise to a right to recover interest has been held not to be applicable to the sovereign government on grounds of public convenience, unless the sovereign's consent to pay interest has been exhibited by an act of the Congress, or by a lawful contract of its executive officers. *United States v. North American Transportation & Trading Co.,* 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935; *United States v. North Carolina,* 136 U.S. 211, 216, 10 S.Ct. 920, 34 L.Ed. 336; *United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 8 S.Ct. 1156, 32 L.Ed. 159; *Richmond, Fredericksburg & Potomac Railroad Co. v. United States,* 95 Ct.Cl. 244; *Hinds v. United States,* 41 F.2d 892, 70 Ct.Cl. 288, 293. Congress has specifically provided by an Act of June 25, 1948, ch. 646, sec. 1, 62 Stat. 978, U.S.C. Title 28 (Supp. IV), § 2516(a), that:

Interest on a claim against the United States shall be allowed in a judgment of the Court of Claims only under a contract or Act of Congress expressly providing for payment thereof.

A provision in a Government contract for the payment of interest must be affirmative, clear-cut, and unambiguous. *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 67 S.Ct. 398, 91 L.Ed. 521. The Supreme Court has held that although an award of interest on a claim against the United States would be just or equitable, this fact alone does not empower the Court of Claims to make such an award on the basis of what they think is a sound policy. The immunity of the United States from liability for interest on unpaid claims is not to be waived by such policy arguments. *United States v. New York Rayon Importing Co.,* 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577. * * * [*Id.* at 356, 121 Ct.Cl. at 431–32.]

We held in *Confederated Salish & Kootenai Tribes v. United States,* 175

Ct.Cl. 451 (1966), *cert. denied,* 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145:

> For many decades *Congress has forbidden interest* on a plaintiff's claim in this court *unless a contract or a statute has "expressly" provided for interest.* 28 U.S.C. § 2516(a). *This rule has won strict adherence in many kinds of cases, including Indian claims. Tillson v. United States,* 100 U.S. 43 [25 L.Ed. 543] (1879); *United States v. North American Transp. Co.,* 253 U.S. 330, 336 [40 S.Ct. 518, 64 L.Ed. 935], (1920); *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585 [67 S.Ct. 398, 91 L.Ed. 521] (1947); *United States v. N. Y. Rayon Importing Co.,* 329 U.S. 654 [67 S.Ct. 601, 91 L.Ed. 577] (1947); *United States v. Alcea Band of Tillamooks,* 341 U.S. 48 [71 S.Ct. 552, 95 L.Ed. 738] (1951); *Loyal Band of Creek Indians v. United States,* 118 Ct.Cl. 373, 382–83, 97 F.Supp. 426, 431 (1951), *cert. denied,* 342 U.S. 813 [72 S.Ct. 27, 96 L.Ed. 615]. * * * [Emphasis supplied.] [*Id.* at 454.]

The Indians and the Commission rely heavily on the decisions in *United States v. Blackfeather,* 155 U.S. 180, 15 S.Ct. 64, 39 L.Ed. 114 (1894) and *Peoria Tribe v. United States,* 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968) as authority for the allowance of interest here. Their reliance on those cases is misplaced, because they are clearly distinguishable and are not apposite. The Supreme Court held in those cases that treaties existed with the Indians that *required* the payment of interest. Of course, under those circumstances, it was proper for interest to be allowed and paid, as a treaty requirement for interest is one of the exceptions to the no-interest rule. But, we have no such treaty here, and, accordingly, *Blackfeather* and *Peoria* are of no help to the Indians or the Commission.

The Commission attempts to avoid the no-interest rule by calling interest "damages." Here again the cases are squarely against this theory of the Commission.

In *Moran Brothers Co. v. United States,* 61 Ct.Cl. 73 (1925), we held:

> * * * Calling interest "damages" or loss does not deprive it of being interest, and the statute forbids the allowance of interest. It is frequently the case that interest, where not stipulated for, is allowed by the courts as damages for the detention of money or as compensation to which a plaintiff is entitled, but this rule is not applicable to the sovereign, "and, as has been settled on grounds of public convenience, it is not to be awarded against a sovereign government, unless its consent to pay interest has been manifested by an act of its legislature or by a lawful contract of its executive officers." *United States v. North Carolina,* 136 U.S. 211, 216 [10 S.Ct. 920, 34 L.Ed. 336]. See also *Sherman case* [*United States v. Sherman*], 98 U.S. 565 [25 L.Ed. 235]; *Angarica v. Bayard,* 127 U.S. 251, 260 [8 S.Ct. 1156, 32 L.Ed. 159]. [*Id.* at 106.]

In *Ramsey v. United States, supra,* we held:

> * * * The payment of interest as such was neither expressly provided for by the corporation's contract with the War Department, nor by any Act of Congress. Plaintiffs attempt to avoid the effect of this *by designating their claim as one for damages,* consisting of interest on amounts paid out by the corporation to third persons. But, as this court pointed out in *Moran Brothers Co. v. United States,* 61 Ct.Cl. 73, 106, *"Calling interest 'damages' or loss does not deprive it of being interest, and the statute forbids the allowance of interest."* [Emphasis supplied.] [*Id.* 101 F.Supp. at 356, 121 Ct.Cl. at 432.]

The Supreme Court said in *Cherokee Nation v. United States,* 270 U.S. 476, 46 S.Ct. 428, 70 L.Ed. 694 (1926):

> * * * The additional interest now claimed is sought really *as damages* for the delay of Congress in appropriating the sum due in 1895 as the United States promised in the 1891 agree-

ment. *But the rule as to interest against the United States does not allow us to adjudge interest as damages at all.* Congress must expressly provide for it or the contract must so provide. * * * [Emphasis supplied.] [*Id.* at 490, 46 S.Ct. at 433.]

On occasion, courts have felt that certain special circumstances warranted an exception to the interest rule. In *Goltra v. United States,* 91 Ct.Cl. 42 (1940), because the jurisdictional act permitted judgments "for just compensation" the court concluded that:

> Judgment is entered for the plaintiffs in the sum of $350,000, with interest at six percent per annum, not as interest but as a part of just compensation, * * *. [*Id.* at 75.]

On appeal, the Supreme Court reversed, *United States v. Goltra,* 312 U.S. 203, 61 S.Ct. 487, 85 L.Ed. 776 (1941), holding that the traditional rule against allowing interest must be applied. [*Id.* at 207, 211, 61 S.Ct. 487.]

In *Thayer-West Point Hotel Co. v. United States,* 64 F.Supp. 565, 106 Ct.Cl. 60 (1946), this court concluded that:

> Both statute and contract expressly provide for the payment of "just compensation." * * * [*Id.* at 569, 106 Ct.Cl. at 81.]

The court allowed four percent interest on the principal sum. On appeal, *United States v. Thayer-West Point Hotel Co.,* 329 U.S. 585, 61 S.Ct. 398, 91 L.Ed. 521 (1947), the Supreme Court reversed our allowance of interest and after noting that the "just compensation" provisions "may or may not imply an obligation to pay interest" went on to state:

> But in order to override the historical rule [no interest against the United States] * * * something more is necessary than an equivocal use of the term "just compensation." It is not enough that the term might be construed to include the payment of interest. * * * [T]here must be a provision in the contract "expressly stipulating for the payment of interest." That provision must be affirmative,

clear-cut, unambiguous; * * *. [*Id.* at 590, 67 S.Ct. at 400.]

*See also United States ex rel. Angarica v. Bayard,* 127 U.S. 251, 259–60, 8 S.Ct. 1156, 32 L.Ed. 159 (1888), wherein the United States had assumed a duty to invest certain trust moneys. Plaintiffs maintained that they were. entitled to *incremental or income damages* on the principal amount. However, the Supreme Court pointed out "*but the claim in that respect is not different in character from what it would have been if * * * it were a claim for interest * * *"* [Emphasis supplied] and went on to hold that incremental *damages* based on the investment duty were barred by the general no-interest rule. *Angarica* is cited with approval in *United States v. Thayer-West Point, supra,* 329 U.S. at 590, 67 S.Ct. 398, and also in *Ramsey v. United States, supra,* 101 F.Supp. at 356, 121 Ct.Cl. at 432.

■ Recent Indian cases, applying the principles of *Goltra, Thayer-West Point Hotel, Angarica,* and *Ramsey* above, indicate that the same no-interest rule applies to *any* incremental *damages* sought to be assessed against the United States, whether it be designated interest, as such, or is designated by some other terminology which has the same effect. *See Pawnee Indian Tribe of Oklahoma v. United States,* 301 F.2d 667, 668–70, 157 Ct.Cl. 134, 137, 140, *cert. denied,* 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 498 (1962), where the Commission was reversed for permitting only the present worth of the defendant's consideration payments because this would be tantamount to charging the United States interest. *See also United States v. Delaware Tribe,* 427 F.2d 1218, 192 Ct.Cl. 385 (1970), where the Commission had applied an annual reduction to the Government's offset claims, but this court reversed noting that:

> * * * We conclude that even if it could be said that the $72,600.37 was not interest per se or interest in the strict sense of the word, the act of the Commission in denying this amount as offsets solely by reason of its five per-

cent rule had the effect of granting interest on the award. We do not believe the Commission can do indirectly what it is prohibited from doing directly. [*Id.* 1223, 192 Ct.Cl. at 394.] *Also see United States v. Nez Perce Tribe of Indians,* 194 Ct.Cl. 490, 494–499, *cert. denied,* 404 U.S. 872, 92 S.Ct. 75, 30 L.Ed.2d 116 (1971), where the court, in reversing the Commission, pointed out that *Peoria Tribe v. United States, supra,* did not change the usual rule that absent a breach of a specific treaty obligation, no interest, or its equivalent, can be allowed against the United States.

It may be seen from the foregoing decisions that the character or nature of "interest" cannot be changed by calling it "damages," "loss," "earned increment," "just compensation," "discount," "offset," or "penalty," or any other term, because it is still interest and the no-interest rule applies to it.[1]

The Commission is not consistent in its reasoning. It devoted much of its 123 page decision to a discussion of why the Indians were entitled to an award of interest against the United States, including the following statement, among others:

* * * We are not here awarding *interest* on a judgment for *simple interest,* but including an additional factor in our judgment to make up for the income which should have been, but was not, earned on reinvested *interest.*

The only practical way we can think of to assess *damages* for failure to comply with the law requiring investment and reinvestment of the income *is by awarding compound interest.* [Emphasis supplied.] [31 Ind.Cl. Comm. 427, 529.]

This statement obviously means the Commission awarded both simple and compound interest against the Government. The clear meaning of the decision considered as a whole shows this to be true. In this regard, it is significant that Commissioner Vance was not the slightest bit evasive and minced no words as to his understanding of the award the Commission was making when he stated in his concurring opinion:

Equity and good conscience, dominant principles in these accounting cases, as well as the plain language of the 1841 act, *compel us to award compound interest.* [Emphasis supplied.] [31 Ind.Cl.Comm. 427, 550.]

Yet the Commission says on the other hand it is not awarding interest but damages. See 31 Ind.Cl.Comm. 427, 527 where the Commission said:

In awarding *damages* equal to compound interest * * * for the period between 1883 * * * and ending June 30, 1930, * * *.

* * * [W]e have the authority, and duty, to award *damages* for breach of the 1841 act, *which damages are measured by interest.* * * * [Emphasis supplied.]

Although the Commission speaks of awarding damages, it is clear that it awarded interest, and that this was done principally on the basis of an Act of Congress of 1841, which will be discussed below. Yet we find the astonishing statement of the Commission in its order overruling the motion for rehearing of the Te-Moaks, 33 Ind.Cl.Comm. 417, 424:

The 1841. act does not authorize us to award interest against the Government. * * * [Emphasis supplied.]

Commissioner Vance signed this order as one of the three who made up the majority of the Commission. This statement is diametrically opposed to the statement in his concurring opinion quoted above.

This switching back and forth from an award of interest to damages and back to interest by the Commission would lead one to believe the Commission was well aware that under the law and the facts of this case it had neither jurisdiction nor authority to allow interest on the claim of the Indians against the United

1. Former Chief Judge Jones observed in *Union Pacific RR Co. v. United States,* 91 F.Supp. 762, 117 Ct.Cl. 534 (1950) that calling a billy goat a horse did not make him one.

States, but concluded that it would be right or just for the Indians to receive the interest. This court was reversed by the Supreme Court for awarding interest against the Government on exactly the same basis in *United States v. N. Y. Rayon Importing Co.,* 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577 (1947). There the Supreme Court said:

> The Court of Claims, * * * sought to justify its award of interest on what it thought *"would be right or just."* * * *
>
> But assuming that the *equities* of the situation all favor the owners of the refund claims, the Court of Claims did not thereby acquire power to carve out an implied exception to the plain words of § 177(a). Had Congress desired to permit the recovery of interest in situations where the Court of Claims felt it *just or equitable,* it could have so provided. The absence of such a provision is conclusive evidence that the court lacks any power of that nature. Indeed, *any other conclusion would permit the Court of Claims to supply the consent which only Congress can give to the imposition of interest against the United States.* [Emphasis supplied.] [*Id.* at 659–60, 67 S.Ct. at 604.]

■ Obviously, the same reasoning applies to the lack of power of the Commission to award interest, unless the requirements of the no-interest rule are met. *See also United States v. Omaha Tribe of Indians,* 253 U.S. 275, 283, 40 S.Ct. 522, 64 L.Ed. 901 (1920), in which the Supreme Court held that the rule of *equity* would not take the case out of the usual no-interest rule even though the jurisdictional act called for a consideration of both *equitable* and legal claims. No matter how high the purpose or how benevolent the motive, neither this court not the Commission can award interest against the Government unless the requirements of the no-interest rule have been met. *See also Loyal Band of Creek Indians v. United States,* 97 F.Supp. 426, 431, 118 Ct.Cl. 373, 382–83,

*cert. denied,* 342 U.S. 813, 72 S.Ct. 27, 96 L.Ed. 615 (1951).

In any event, we hold that the order of the Commission was an award of simple and compound interest on the claim of the Indians against the United States. This award was contrary to law, as shown by the foregoing authorities, unless there was a contract, treaty, or agreement between the Indians and the United States or an Act of Congress expressly providing for the payment of interest. Neither the Indians nor the Commission contend that a contract, treaty or agreement existed that provided for the payment of interest. Therefore, the sole question is whether there was any statute or other Act of Congress that expressly required the interest payment.

The Indians and the Commission contend that there were two statutes that required or at least authorized the award of interest in this case. These statutes were: (1) The Act of September 11, 1841, ch. 25, 5 Stat. 465, and (2) the Indian Claims Commission Act of August 13, 1946, 25 U.S.C. § 70a (1970). We will first consider the 1841 Act upon which the Indians and the Commission principally rely, which reads as follows:

> Chap. XXV.—*An Act to repeal a part of the sixth section of the act, entitled "An act to provide for the support of the Military Academy of the United States for the year eighteen hundred and thirty-eight, and for other purposes," passed July seventh, eighteen hundred and thirty-eight.*
>
> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That so much of the sixth section of an act entitled, "An act to provide for the support of the Military Academy of the United States for the year eighteen hundred and thirty-eight, and for other purposes," as requires the Secretary of the Treasury to invest the annual interest accruing on the investment of the money aris-

ing from the bequest of the late James Smithson, of London, in the stocks of States, be, and the same is hereby, repealed. And the Secretary of the Treasury shall, until Congress shall appropriate said accruing interest to the purposes prescribed by the testator for the increase and diffusion of knowledge among men, invest said accruing interest in any stock of the United States bearing a rate of interest not less than five per centum per annum.

Sec. 2. *And be it further enacted,* That all other funds held in trust by the United States, and the annual interest accruing thereon, when not otherwise required by treaty, shall in like manner be invested in stocks of the United States, bearing a like rate of interest.

Sec. 3. *And be it further enacted,* That the three clerks, authorized by the act of June twenty-third, eighteen hundred and thirty-six, "to regulate the deposits of the public money," be, and hereby are, directed to be retained and employed in the Treasury Department, as provided in said act, until the state of the public business becomes such that their services can conveniently be dispensed with.

■ The reliance by the Indians and the Commission on the 1841 Act as authority for the award of simple and compound interest on I.M.P.L. Funds is misplaced. In the first place, the Act did not expressly require the Government to pay interest to Indian tribes or to anyone else. It was merely a directive to the appropriate officers of the Government holding trust funds that were *required* by treaty, contract, or statute to be invested, to invest them *only* in stocks of the United States, bearing interest at not less than five percent per annum. The primary purpose of the Act was to prevent any future investment of trust funds in state stocks or bonds. Thus the Act did not create any obligation on the Government to pay interest on trust funds, but only provided *where* they must be invested if any statute or treaty

required them to be productive. The reason for the passage of the Act and its purpose can be better understood by a brief consideration of the economic and financial conditions that existed in the country immediately prior to and at the time of its enactment.

On January 9, 1837, Congress enacted a statute (5 Stat. 135) that provided that the proceeds from lands ceded by Indians to the United States should be paid into the Treasury and if the treaties required them to be invested, such investments were to be made under the direction of the President. By 1838 there were 13 Indian trust funds in this category and all of them were invested in state bonds. However, soon after the 1837 Act was passed, a severe economic depression occurred throughout the Nation (called a panic in those days), and within a matter of weeks after the passage of the Act most banks suspended specie payments. Many states defaulted on their bonds including Tennessee, Alabama, Mississippi, and Maryland. This depression was still going on in 1841 and afterwards.

It was against this background that Congress considered changing the law that would allow trust funds to be invested in state bonds, because Congress was genuinely concerned about the default of the states on their bonds. Congressman John Quincy Adams (formerly President Adams) introduced a resolution in the Congress providing:

That the further investment of any public funds of the United States in stocks of the several states ought forthwith to be prohibited by law.[2]

Because of the depression (panic), the default by various states on their bonds, and the deep concern of Congress with reference to Government trust funds that were invested in state bonds, the Congress enacted the Act of 1841. The sole purpose of the Act was to prohibit future investment of trust funds, that were required to be invested, in state bonds, and to accomplish this purpose the Act required such funds to be invested in bonds of the United States.

**2.** Cong. Globe, Sept. 1, 1841 (B–3).

At the time the Act was passed in 1841 there were very few I.M.P.L. Funds in existence and those that did exist were in the hands of local Government agents for use by them for the benefit of Indians on a day to day basis. None of these funds were on deposit in the Treasury at that time. The Congress could not have intended that the 1841 Act apply to I.M.P.L. Funds because they scarcely existed, were not in the Treasury, and were not capable of being invested.

Furthermore, in 1841 there were 28 Indian funds held in trust by the Government, all of which had been specifically designated as productive by Congress, or the President had been given authority by Congress to invest them. These were the funds which the Act required to be invested in United States bonds and their investment in state bonds was prohibited.

During the years from 1841 to 1930, no one in the Executive Department of the Government considered the 1841 statute as authority to invest Indian trust funds nor as a law requiring the Government to pay interest on such funds. Subsequent to 1841, the Government continued to make treaties with Indians and enacted statutes in which Indian funds created thereby were required to be invested. These funds were invested according to the provisions of these later treaties and statutes. Not once in 130 years was the 1841 statute cited as authority to invest Indian trust funds that were required to be made productive by treaties or statutes made or enacted after 1841. This long administrative practice by the Executive Department charged with handling and investing Indian trust funds, which was concurred in by Congress, is entitled to great weight in determining the intent of Congress when it enacted the 1841 statute. In this regard, the Supreme Court held in *United States v. Jackson*, 280 U.S. 183, 50 S.Ct. 143, 74 L.Ed. 361 (1930):

> It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration. *United States v. Cerecedo Hermanos y Compania*, 209 U.S. 337, 28 S.Ct. 532, 52 L.Ed. 821; *Robertson v. Downing*, 127 U.S. 607, 8 S.Ct. 1328, 32 L.Ed. 269; *United States v. Healey*, 160 U.S. 136, 16 S.Ct. 247, 40 L.Ed. 369, and such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required. * * * [*Id.* at 193, 50 S.Ct. at 146.]

During the more than 130 years the 1841 statute has been in existence, no court that we know of has allowed interest on a claim against the United States in a non-eminent domain case unless there was a contract, treaty, or statute (other than the 1841 statute) that expressly provided for interest. Every case we have cited in this opinion denying interest has been decided since the 1841 Act was passed. During this long period of time it has been the universally accepted rule that the requirements of the no-interest rule be met if interest is to be allowed. For instance, in the dissenting opinion of Judge Davis, concurred in by Judge Durfee, of our court in *Peoria Tribe of Indians v. United States*, 369 F.2d 1001, 177 Ct.Cl. 762 (1966), *rev'd*, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), he stated:

> I join in the court's opinion on the first claim, but dissent from the disposition of the *demand for interest* on the $172,762.04 awarded by the Indian Claims Commission.

> The sole ground for this claim is Article 7 of the 1854 Treaty, 10 Stat. 1084, which provided:

>> And as the amount of the annual receipts from the sales of their lands, cannot now be ascertained, it is agreed that the President may, from time to time, and upon consultation with said Indians, determine how much of the net proceeds of said sales shall be paid them, and how much shall be invested in safe and profitable stocks, the interest to

be annually paid to them, or expended for their benefit and improvement.

*It is agreed that if this is read as containing an express provision for interest appellants can recover, otherwise not.* See *United States v. Alcea Band of Tillamooks,* 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *Confederated Salish and Kootenai Tribes v. United States,* 175 Ct.Cl. [451, 454] (1966), *cert. denied,* Oct. 24, 1966, 385 U.S. 921, 87 S.Ct. 228 [17 L.Ed.2d 145]. \* \* \* [Emphasis supplied.] [*Id.* at 1006, 177 Ct.Cl. at 770–71.]

At that time the 1841 statute had been in existence for over 125 years, but no attention was paid to it. The above statement was a correct one, but it would not have been correct if the 1841 Act required the payment of interest as the Indians contend in the instant case.

During the long period of time that the 1841 statute has been on the books, no court that has considered it has held that the Act required the Government to pay interest on any trust fund unless there was a contract, treaty, or statute (other than the 1841 Act) requiring the payment of interest.

The case of *United States ex rel. Angarica v. Bayard,* 4 Mackey 310 (D.C.Sup. Ct.1885), *aff'd,* 127 U.S. 251, 8 S.Ct. 1156, 32 L.Ed. 159 (1888), standing alone is sufficient authority to overturn the decision of the Commission in the instant case. In that case the Government collected a sum of money in arbitration proceedings from Spain for plaintiff Angarica for injuries and damages caused to her by Spain while in Cuba. The Government paid all of the money to Angarica except $41,129.74, which is retained and invested until such time as Spain paid the expenses of arbitration. When Spain paid these expenses, the Government paid the $41,129.74 to Angarica but did not pay her the interest it had earned. She sued for the interest, claiming that the 1841 statute (involved in the instant suit) required the Government to pay her the interest. The Supreme Court of the District of Columbia, after quoting the 1841 statute, stated:

\* \* \* At the time of the enactment of 1841 there existed certain treaties with the Indians, containing stipulations for the payment to them, annually, of interest upon the proceeds of lands ceded by them; and it had already been provided by the act of January 9, 1837 (5 Stat., 135), which is now embodied in the Revised Statutes as section 2096, that these funds should be invested in securities at not less than five percent interest. *It was clearly for trusts of this definite character, established as we have said, by law, that the act of 1841 proposed to establish a general system.* This is especially indicated by the exception in that act of cases regulated by treaty. The reference is to these Indian treaty funds. *We think, then, that the statute did not apply to the transaction in question,* and it is evident that the executive did not propose to conform to its requirements. [Emphasis supplied.] [*Id.* at 324.]

The court denied Angarica's suit for interest and dismissed her petition. It is clear from the above statement of the court that the 1841 Act as regards Indian trust funds was limited to "certain treaties with the Indians, containing stipulations for the payment to them annually of interest upon the proceeds of lands ceded by them," and that "it was clearly for trusts of this definite character, established \* \* \* by law" that the Act of 1841 applied, and not otherwise.

The Supreme Court affirmed the *Angarica* case in 127 U.S. 251, 8 S.Ct. 1156, 32 L.Ed. 159 (1888). In its opinion the Court said:

\* \* \* It has been established, as a general rule, in the practice of the government, that interest is not allowed on claims against it, whether \* \* \* they arise in the ordinary business of administration or under private acts of relief, \* \* \*. [*Id.* at 260, 8 S.Ct. at 1161.]

In support of this statement, the Court cited eleven opinions of the Attorney General: 1, 268; 1, 550; 1, 554; 3, 635; 4, 14; 4, 136; 4, 286; 5, 105; 7, 523; 9, 57, and 9, 449. The Court went on to say:

> Not only is this the general principle and settled rule of the executive department of the government, but it has been the rule of the legislative department, because congress though well knowing the rule observed at the treasury, and frequently invited to change it, has refused to pass any general law for the allowance and payment of interest on claims against the government. * * * [*Id.* at 260, 8 S.Ct. at 1161.]

It is particularly significant that the Supreme Court stated that Congress well knew the general rule of no-interest on claims against the Government and had been invited frequently to change it, but had refused to do so. At that time (1888) the 1841 statute had been in existence for 47 years. The law was definitely established by this decision of the Supreme Court that the 1841 Act applied only to funds created by a treaty or by a specific statute requiring the payment of interest. The decision of the Commission in the instant case is in direct conflict with the decisions of the Supreme Court of the District of Columbia and of the Supreme Court in the *Angarica* case.

But we do not have to stop here. Other courts have considered the 1841 statute and have handed down decisions which directly conflict with the decision of the Commission in this case. In *Omaha Tribe of Indians v. United States*, 53 Ct.Cl. 549 (1918), *rev'd in part and aff'd in part*, 253 U.S. 275, 40 S.Ct. 522, 64 L.Ed. 901 (1920), the court awarded judgment to the Indians for $18,202.19 representing default by two Government agents in disbursing treaty funds, but did not award interest on the claim. On appeal to the Supreme Court the Indians sought to recover the interest, quoting the 1841 statute and making essentially the same arguments made by the Indians and the Commission in the instant case.[3] However, the Supreme Court rejected the arguments of the Omahas and refused to allow them interest. This decision was handed down 30 years after the *Angarica* decision, but to the same effect. The 1841 statute had been in existence for 77 years at this time (1918).

In *Cherokee Nation v. United States*, 270 U.S. 476, 46 S.Ct. 428, 70 L.Ed. 694 (1926), the Supreme Court refused to grant interest on interest although the Cherokees urged that it do so on the basis of the 1841 statute. In that case the Supreme Court said:

> When we consider the rule requiring an express provision of contract or statute to justify the imposition of interest in adjudicating any claim against the United States, we can find nothing in the circumstances of this case to increase the interest as adjudged. * * * The only contractual obligation here is for simple five percent. interest until payment.

> *     *     *     *     *     *

> And by § 3659 of the Revised Statutes, re-enacting § 2 of the Act of Congress of September 11, 1841, 5 Stat. 465, which provides:

> "All funds held in trust by the United States, and the annual interest accruing thereon, when not otherwise required by treaty, shall be invested in stocks of the United States, bearing a rate of interest not less than five per centum per annum."

> It is urged that the largest item, of $1,111,284.70, was taken out of a $5,000,000 trust fund held by the United States for the benefit of the Cherokees, and therefore that it should be treated as if it were always in the Treasury of the United States, held in trust for the Indians, and as if the United States had collected the interest thereon out of the invested stocks,

---

3. See Omaha Brief, Record and Briefs in U.S. cases, U.S. Supreme Court, October 1919 Term, Vol. 29, Dept. of Justice Library.

and had refused to pay it over as annuities to the Indians. *This claim proves too much. It would require compound interest brought about by annual or semi-annual rests for near a century, an amount that the Solicitor General suggests would be equal to the national debt.* The argument is shown to be wholly without support in the circumstance that the Cherokees and the United States by the resolution of the Senate in 1850, agreed upon the interest for such debts as that of 5 percent. until paid. * * * [Emphasis supplied.] [*Id.* at 490, 492, 46 S.Ct. at 434.]

It is to be observed that the Supreme Court was well aware of the provisions of the Act of 1841. Also, it should be pointed out that the 1841 Act speaks of simple interest as well as interest on interest (compound interest). Here we find that Supreme Court holding in no uncertain terms that the 1841 Act does not require compound interest to be paid *because* the *treaty* only *required* simple interest at five percent. At the time of this decision (1926) the 1841 Act had been in existence for 85 years. It cannot be said that the Supreme Court was ignorant of its existence or of its provisions because it is quoted in the Court's opinion. Under these circumstances, it is especially significant that the Court recognizes and repeats the no-interest rule in its opinion when it said "When we consider the rule requiring an *express provision of contract or statute* to justify the imposition of interest in adjudicating any claim against the United States * * *. The only *contractual obligation here* is for simple five per cent. interest * * *." [Emphasis supplied.] [270 U.S. at 490, 46 S.Ct. at 433.] It must be concluded that the decision of the Commission is in direct conflict with the *Cherokee* decision, because if the 1841 Act does not require the payment of compound interest by the United States in the absence of a treaty or statute so providing, as the Supreme Court holds, by the same rule simple interest would not be required to be paid under like

circumstances, either. The Commission erred in allowing simple interest, as well as compound interest, under the 1841 statute in this case.

In *United States v. Blackfeather,* 155 U.S. 180, 192, 15 S.Ct. 64, 39 L.Ed. 114 (1894), the 1841 statute is mentioned in passing, but the Court allowed five percent interest because a treaty in that case required it to be paid and not because of the 1841 statute. A similar result occurred in *Ottawa & Chippewa Indians v. United States,* 42 Ct.Cl. 240 (1907). In that case the court noticed the 1841 Act but awarded simple interest at five percent only because the treaty in that case expressly required it. Thus, it can be seen that *Blackfeather* and *Ottawa & Chippewa Indians* are within an exception to the no-interest rule and are of no help to the Indians or the Commission in the instant case.

The only other case we have found that considers the 1841 Act is our own decision in *Bonnar v. United States,* 438 F.2d 540, 194 Ct.Cl. 103 (1971). In that case the alien property custodian had seized and sold property under the Trading with the Enemy Act, 50 U.S.C. App. § 9(a) (1970) during the second world war and held the proceeds in trust without investing it. After the war the owners sued for and were given a judgment for the proceeds of the sale of their property. They also claimed interest on such proceeds under the 1841 Act, now codified as 31 U.S.C. § 547a, but we denied them a recovery of the interest. As to the interest, we held in an opinion written by Judge Durfee of our court as follows:

Plaintiffs' final argument for interest requires us to consider the 1962 amendment to § 9(a) of the Act which directs that the proceeds of sale "shall be held *in trust* by the Secretary of the Treasury", * * * [Emphasis by Judge Durfee] 50 U.S.C. App. § 9(a) (1964), in conjunction with 31 U.S.C. § 547(a) (1964), which provides:

*All funds held in trust* by the United States, and the annual interest accruing thereon, when not other-

wise required by treaty, *shall be invested* in stocks of the United States, bearing a rate of interest not less than 5 per centum per annum. [Emphasis by Judge Durfee.]

From these statutes and some familiar principles of trust law regarding the obligation of a trustee to invest trust funds (see Restatement, 2d, Trusts § 181), plaintiffs' counsel conclude that the Government has been under a duty to invest the sales proceeds in question, and that, if the Government has not done so, then it has been enjoying "the economic benefits of an interest-free loan." *To this argument, we have two responses. First, § 9(a) of the Act could have specifically referred to 31 U.S.C. § 547(a), or required the Treasurer to invest the proceeds of any sale or liq-. uidation. However, that section makes no such reference, and we regard this as a strong indication that Congress intended to limit recovery to the allocated sales proceeds.* [Emphasis supplied.] Second, and most importantly, this question was carefully considered in *Gmo, Niehaus & Co. v. United States*, 373 F.2d 944, 179 Ct.Cl. 232 (1967), which was decided after the Act was amended in 1962, and it was answered adversely to plaintiffs' contentions. *Niehaus* involved the recovery of damages by plaintiffs on a claim for the value of money or property unlawfully appropriated by vesting under the Trading With the Enemy Act. Particularly pertinent is the court's discussion of defendant's liability for any post-sale increment. In that regard, the court stated:

In this connection, it should be noted that Section 7(c) of the Trading With the Enemy Act, as amended (50 U.S.C. App. § 7(c) (1964)), provides that in a case involving the unlawful vesting and the subsequent sale by the Alien Property Custodian of the property of a person who was not an enemy national, any recovery by the owner of the property "shall be limited to and enforced against the net proceeds received therefrom and held by the Alien Property Custodian or by the Treasurer of the United States." * * * Although this limitation of the Trading With the Enemy Act may not be strictly applicable in terms to plaintiffs' case, we should be governed by *its indication of the Congressional policy as to maximum recovery. Neither the post-sale increment in value nor interest is recoverable under Section 7(c), and neither should be recoverable here.* [Emphasis by Judge Durfee.] *Cf. Sac & Fox Tribe of Indians of Oklahoma v. United States* [383 F.2d 991, 179 Ct.Cl. 8, 24], decided this day, Part VI of that opinion.

* * * * * *

* * * *In non-eminent domain cases, the normal rule is that interest is not recoverable unless authorized by statute or contract, 28 U.S.C. § 2516(a). In this instance there is neither statutory nor contractual authorization.* [Emphasis supplied.] *On the contrary, Section 7(c) of the Trading With the Enemy Act looks the other way.* [Emphasis by Judge Durfee.] [373 F.2d 961–962, 179 Ct.Cl. at 262–273.]

Plaintiffs allude to certain factual differences between *Niehaus* and the instant case, but none dilute the full force and effect of the court's general interpretation of § 7(c) of the Act.

In the absence of compelling evidence to the contrary, we must always be guided by the Congressional intent which, in this instance, is clearly that *the Government must specifically consent to be liable for interest in express terms, rather than by implication,* except in the most extreme cases, such as *Henkels* [*Henkels v. Sutherland,* 271 U.S. 298, 46 S.Ct. 524, 70 L.Ed. 953 (1926)], in which an alternate approach is desirable and necessary to avoid a serious inequity, *i. e.,* unjust enrichment. Therefore *plaintiffs are not en-*

*titled to interest on the allocated sales proceeds of their shares of GDC stock.* [Emphasis supplied.] [438 F.2d at 572–73, 194 Ct.Cl. at 163–64.]

As applied to the instant case, the first reason we gave in *Bonnar* for denying interest could be paraphrased with reference to the 1883 Act which placed the I.M.P.L. Funds in the instant case in trust in the Treasury for the first time, as follows:

The 1883 Act could have specifically referred to the 1841 Act, or required the Treasurer to invest the I.M.P.L. Funds. However, the 1883 Act makes no such reference, and we regard this as a strong indication that Congress intended that the Indians would receive only the amount of the I.M.P.L. Funds deposited in the Treasury.

█ Our holding in that case that "the Government must specifically consent to be liable for interest in express terms, rather than by implication" is very significant. We were, of course, saying that the efforts of the plaintiff to recover interest on the theory that it was allowed *by implication* under the 1841 statute would not be approved. The courts have held over and over again, as shown by the decisions cited above, that interest on a claim against the Government will not be allowed *by implication* but must be expressly provided for in a treaty or statute. The decision in *Bonnar* is squarely against the Indians' claim for interest in this case, and the order of the Commission allowing interest is in direct conflict with that decision.

In the foregoing paragraphs, we have reviewed every case we have been able to find that has mentioned, noticed or considered interest on claims against the Government under the 1841 statute. All of them that have passed on the meaning of the Act have denied claims for interest such as those asserted by the Indians on I.M.P.L. Funds in this case.

One other case should be mentioned, although it does not involve the 1841 statute, it does contain a claim for interest on I.M.P.L. Funds as in the instant case. We refer to the case of *Creek Nation v. United States,* 78 Ct.Cl. 474 (1933). In that case the Creeks recovered a judgment against the Government for $144,106.01. They claimed interest in the sum of $1,401,195.01. The facts showed that the Creeks claimed interest on the funds that were carried on the books of the Treasury as follows: (1) General Creek fund, (2) Interest on General Creek fund, (3) I.M.P.L. Funds, and (4) Interest on Creek moneys on deposit in banks. There was a treaty with the Creeks that required the payment of interest on the "General Creek Fund," but not on the other funds. The Creeks contended that the I.M.P.L. Funds should have been placed in the "General Creek Fund" and interest paid thereon. The court rejected this theory and denied interest on the I.M.P.L. Funds, saying:

\* \* \* Moneys arising from the sources stated [IMPL funds] clearly could not be credited to the interest-bearing "Creek general fund." \* \* There being no treaty or statutory obligation on the part of the United States to pay interest on Creek tribal funds, [including IMPL funds] other than those belonging to the "Creek general fund", interest can be allowed only on such of the unauthorized disbursements as were made from that fund. [*Id.* at 505.]

Based on the facts described above and the court decisions we have cited, we hold that the purpose of the 1841 statute was to prohibit investment of United States trust funds, that were required by treaty or statute to be productive, in state bonds and to require them to be invested in United States securities, and that the Act did not require the payment by the United States of interest on any fund that was not expressly required to be productive by a contract, treaty, or statute. Consequently, the Indians in the instant case are not entitled to recover interest from the Government on their I.M.P.L. Funds. The 1841 statute simply does not apply to the I.M.P.L. Funds involved in the instant case. The statute is a rather obscure one, having

been enacted over 133 years ago, and during that long period of time no administrative officer of the Government has ever allowed or paid interest because of its provisions, nor has any court ever allowed interest on a claim against the Government because of it. The statute was directory only as to where trust funds that were otherwise required to be made productive could be invested.

The Commission is clearly in error in awarding compound interest in this case. Even when simple interest is required to be paid by treaty or statute, all of the cases hold that compound interest cannot be allowed against the Government. In *Menominee Tribe of Indians v. United States*, 97 Ct.Cl. 158, 162 (1942) we held:

> It is well settled that the United States cannot be charged with interest except where liability therefor is clearly imposed by the statute or assumed by contract. *United States v. North Carolina*, 136 U.S. 211 [10 S.Ct. 920, 34 L.Ed. 336]; *Cherokee Nation v. United States*, 270 U.S. 476 [46 S.Ct. 428, 70 L.Ed. 694]; *United States v. Worley, Administratrix, et al.*, 281 U.S. 339 [50 S.Ct. 291, 74 L.Ed. 887]; *The Ute Indians v. United States*, 45 Ct.Cl. 440, 470. In *Cherokee Nation v. United States, supra*, the court said [270 U.S.] at pp. 490, 491 [46 S.Ct. 428]:
>
> > In view of the care with which Congress and this Court in interpretation of the legislative will, have limited the collection of simple interest against the Government, a *fortiori* must compound interest be denied to appellant unless provision therefor is made in the contract of 1891, or in the statute of 1919 authorizing this suit, and it is to be found in neither.
>
> The cases cited make it clear that a statute consenting to payment of interest refers to simple interest only, and *any obligation to pay compound interest cannot be implied from general words, but must be based upon clear and unequivocal language leaving no doubt as to the intention of Congress to depart from the general rule so announced as to the right to charge and collect interest from the Government.* The Act of February 12, 1929, *expressly provided for only "simple interest"* upon money held in trust fund accounts, and *this language may not be interpreted as intending to obligate the United States to pay interest upon interest* previously credited upon other interest-bearing funds or accounts. The term "simple interest" has a well-established meaning. [Emphasis supplied.]

In that case we held further:

> We are of opinion that plaintiff is not entitled under the provisions of the Act of February 12, 1929, to recover interest on interest. * * * [*Id.* at 161.]

In *Ute Indians v. United States*, 45 Ct.Cl. 440, 470 (1910) we held that compound interest could not be allowed against the Government:

> No interest, either simple or compound, can be collected from a sovereign except by its consent. (*United States v. North Carolina*, 136 U.S. 211 [10 S.Ct. 920, 34 L.Ed. 336].) In the case at bar the sovereign has agreed to pay interest, and that means simple interest only. But the plaintiffs seek to charge the defendants with compound interest in this case on the ground that the money so received constituted a trust fund, and that in such cases where the fund has been improperly withheld, the trustee is penalized with compound interest. It is elementary as a general proposition, in the absence of a contract to that effect, that interest upon interest is not recoverable for the detention of money, and that is a general rule either at law or equity. (*Perley on Law of Interest*, 159, 160; *In re Ward's estate*, 73 Mich., 220, 228 [41 N.W. 431].) It is only where a trustee, guardian, or executor has acted in bad faith, in abuse of his trust or has been guilty of such gross negligence as to be evidence of a corrupt intention, that compound interest will be charged against him

(*Barney v. Saunders*, 16 How., 535 [14 L.Ed. 1047]; *Perrin v. Leper [Lepper]*, 72 Mich., 446 [454, 40 N.W. 859]; *Vaughan v. Bibb*, 46 Ala., 153; *Smith v. Kennard*, 38 Ala., 695).

*The Government* only acts through its officers and agents and thus in law can never be guilty of fraud, bad faith, or negligence; *hence it can never be penalized by being charged compound interest.* [Emphasis supplied.]

In the case of *Peoria Tribe v. United States*, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), the Supreme Court held that compound interest could not be allowed against the Government without its consent, saying:

Because the United States is not liable for interest on judgments in the absence of an express consent thereto, it cannot be liable for interest on the annual income payments not made. Therefore, if an interest rate measure is adopted by the Commission, it must be simple and not compound interest. [*Id.* at 473 n. 6, 88 S.Ct. at 1140.]

The Supreme Court held in *Cherokee Nation v. United States*, 270 U.S. 476, 46 S.Ct. 428, 70 L.Ed. 694 (1926) that compound interest against the Government must be denied unless provision is made therefor in a contract or statute, saying:

\* \* \* The only contractual obligation here is for simple five per cent. interest until payment.

What the appellant here seeks is compound interest, that is interest on interest from 1895 until now. The general rule even as between private persons is that in the absence of a contract therefor or some statute, compound interest is not allowed to be computed upon a debt. *Whitcomb v. Harris*, 90 Me. 206, 38 A. 138; *Bradley v. Merrill*, 91 Me. 340, 40A 132; *Ellis v. Sullivan*, 241 Mass. 60, 64, 134 N.E. 695; *Tisbury v. Vineyard Haven Water Company*, 193 Mass. 196, 79 N.E. 256; *Lewin v. Folsom*, 171 Mass. 188, 192, 50 N.E. 523; *Wallace v. Glaser*, 82 Mich. 190, 46 N.W. 227, 21 Am. St.Rep. 556; *Blanchard v. Dominion National Bank*, 130 Va. 633, 637, 108 S.E. 649, 27 A.L.R. 78; *Finger v. McCaughey*, 114 Cal. 64, 66, 45 P. 1004; *Cullen v. Whitham*, 33 Wash. 366, 368, 74 P. 581. In view of the care with which Congress, and this court in interpretation of the legislative will, have limited the collection of simple interest against the Government, *a fortiori* must compound interest be denied to appellant unless provision therefor is made in the contract of 1891, or in the statute of 1919 authorizing this suit, and it is to be found in neither. [*Id.* at 490–91, 46 S.Ct. at 433.]

*See also Creek Nation v. United States, supra,* and *United States v. Blackfeather, supra.* All of the cases hold that even where a treaty or statute require the payment of interest, only simple interest is intended and compound interest cannot be awarded against the Government.

■ The Commission asserts that aside from the 1841 statute, the Indian Claims Commission Act authorizes it to award simple interest and compound interest to the Indians against the Government in this case. We do not agree. The Indian Claims Commission Act nowhere authorizes the Commission to award any kind of interest against the Government. All of the cases that have considered the question have ruled the other way. *See Osage Nation of Indians v. United States*, 97 F.Supp. 381, 424–25, 119 Ct.Cl. 592, 671–72, *cert. denied*, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 672 (1951); *Kiowa, Comanche & Apache Tribes v. United States*, 163 F.Supp. 603, 609–10, 143 Ct.Cl. 534, 543–44 (1958); *Blackfeet & Gros Ventre Tribes v. United States*, 2 Ind.Cl.Comm. 302, 314 (1952), *aff'd*, 119 F.Supp. 161, 127 Ct.Cl. 807, *cert. denied*, 348 U.S. 835, 75 S.Ct. 58, 99 L.Ed. 658 (1954); *United States v. Nez Perce Tribe of Indians*, 194 Ct.Cl. 490, 499, *cert. denied*, 404 U.S. 872, 92 S.Ct. 75, 30 L.Ed.2d 116 (1971), and *Loyal Band of Creek Indians v. United States*, 97 F.Supp. 426, 431, 118 Ct.Cl.

373, 382–83, *cert. denied*, 342 U.S. 813, 72 S.Ct. 27, 96 L.Ed. 615 (1951).

We hold that the Indian Claims Commission Act does not authorize the Commission to award simple interest or compound interest on a claim against the Government in any non-eminent domain case unless a contract, treaty, or statute expressly provides for the payment of such interest; and that there is no such contract, treaty, or statute in the instant case.

The serious consequences of the decision of the Commission in this case which allows simple interest and compound interest to the Indians against the Government on their claims from 1883 to 1930 on the basis of the 1841 statute cannot be overemphasized. The decision would open the doors to claims for simple and compound interest of beneficiaries of every trust fund, Indian and otherwise, held by the United States from 1841 to 1975, or until payment, and the ultimate cost to the Government could be an astronomical amount. The Government estimates it could amount to billions of dollars. We have no way of determining whether or not this is correct, but it stands to reason that the potential cost of the decision would be tremendous. This possible enormous cost to the Government is naturally of great concern to this court, although it does not govern the outcome of this suit. Nevertheless, it has caused us to consider the decision of the Commission with great care.

■ As stated in the beginning of this opinion, the Te-Moaks claimed that they should be awarded interest on shortages in fulfillment of the Government's obligations under the Treaty of October 1, 1863, 18 Stat. 689. The Commission correctly treated these shortages in payments as breaches of contractual obligations rather than as breaches of trust and denied interest on the shortages. *See United States v. Omaha Indians*, 253 U.S. 275, 40 S.Ct. 522, 64 L.Ed. 901 (1920), *aff'g in part, rev'g in part*, 53 Ct.Cl. 549 (1918); *Confederated Salish & Kootenai Tribes v. United States*, 175

Ct.Cl. 451, *cert. denied*, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966); *Rogue River Tribe of Indians v. United States*, 64 F.Supp. 339, 344, 105 Ct.Cl. 495, 552–53 (1946); *Choctaw Nation v. United States*, 91 Ct.Cl. 320, 402 (1940), *cert. denied*, 312 U.S. 695, 61 S.Ct. 730, 85 L.Ed. 1130 (1941); *Tillson v. United States*, 100 U.S. 43, 47, 25 L.Ed. 543 (1879); *Ramsey v. United States*, 101 F.Supp. 353, 356, 121 Ct.Cl. 426, 431–32 (1951), *cert. denied*, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952); *Peoria Tribe of Indians v. United States*, 369 F.2d 1001, 177 Ct.Cl. 762 (1966), *rev'd on other grounds*, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), and decision of the Comptroller General, A–27308 of May 31, 1929. In this connection, we held in *Confederated Salish & Kootenai Tribes v. United States, supra* :

* * * The taking away of *contractual rights*, via a rupture of the contract, is of course not equivalent to a taking of *property* under the Fifth Amendment. It is commonplace for the defendant to be held in this court for having gone back on a promise and thus denied a plaintiff his rights. *Interest is not paid on an award of that kind for a breach of contract. Choctaw Nation v. United States*, 91 Ct.Cl. 320, 402–03 (1940), *cert. denied*, 312 U.S. 695 [61 S.Ct. 730, 85 L.Ed. 1130] (1941). * * * [Footnote omitted.] [Emphasis supplied.] [*Id.* at 455.]

Again in *Peoria Tribe of Indians v. United States, supra*, we held:

Admittedly no interest is allowable for the breach of an obligation to pay over money to the Indians. *Confederated Salish and Kootenai Tribes v. United States*, 175 Ct.Cl. [451] (1966), *cert. denied*, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 and *Ramsey v. United States*, 101 F.Supp. 353, 121 Ct.Cl. 426, 431–32 (1951), *cert. denied*, 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952). * * * [*Id.* at *1006, 177 Ct.Cl.* at *770 n. 9.*]

The Commission was correct in denying the Te-Moaks interest on the treaty

shortages, and its decision in that regard should be affirmed.

Accordingly, the decision and order of the Commission awarding simple interest and compound interest, whether called interest or damages, to the appellee Indian tribes on I.M.P.L. Funds from 1883 to 1930 is reversed.

The decision and order of the Commission denying the claim of the Te-Moaks, cross-appellants, for interest on shortages in payment by the Government of its obligations under the Treaty of October 1, 1863, is affirmed.

The case is remanded to the Indian Claims Commission for further proceedings in accordance with this opinion.

*Affirmed in part, reversed in part, and remanded.*

NICHOLS, Judge (concurring):

I concur in the result. The opinion accepts without question the Government's explanation of the 1841 Act. Though an air of certainty in a judicial opinion is a desirable quality, in this instance I deem it overdone. I believe reasonable persons can differ, as they have. On the other hand, the dissent would fasten on the Government the duties and obligations of a testamentary trustee with respect to all Indian funds it collected, managed, and disbursed prior to 1930. That role resembles in some respects that of a trustee, but it also looks like that of a banker. Unlike, e. g., *United States v. Sioux Nation of Indians et al.*, 518 F.2d 1298, 207 Ct.Cl. —— (decided June 25, 1975), it is not possible to point to any contemporary pronouncement, by Indians or whites, that the dealings with these funds essentially as bank checking accounts were unlawful or reflected a lack of fair and honorable dealings. The then state of the authorities makes it unlikely anyone would have so concluded had he studied the matter. The dissent does not construe the 1841 statute literally, any more than the majority does. If applicable, and taken literally, the statute would have impounded all IMPL funds for investment in United States "stocks", not just the excess over that needed for Indian support.

I simply cannot believe the Indian Claims Commission Act, 25 U.S.C. § 70, was written to fix on the United States a penalty liability of this speculative and dubious character.

DAVIS, Judge (dissenting in part):

The appeal is not from a simple accounting decision of the Indian Claims Commission, in which the disagreement of the parties revolves around technical accounting standards or factual differences. Rather, it is an appeal from grant of an accounting request in the most traditional sense—a claim that certain tribal rights (granted by statute) have been ignored by the United States, that discovery is required to determine the extent of the breach, and a demand that the defendant be held in damages for its actions. *See* 1 J. Story, Commentaries on Equity Jurisprudence §§ 464–65 (1836).

At the heart of the matter, particularly for the period before 1918 (*see Cheyenne-Arapaho Tribes v. United States*, 512 F.2d 1390, 206 Ct.Cl. —— (1975)),[1] is the proper interpretation of the Act of September 11, 1841, ch. 25, 5 Stat. 465, *now codified at* 31 U.S.C. § 547a. I agree with the majority that without a statutory duty to make trust funds pro-

1. In 1918, upon an appeal by the Secretary of the Interior that he be allowed to invest idle Indian funds in Liberty Bonds, to help both the Indians and the Treasury, Congress passed a law allowing the investment of "the trust funds of any tribe or individual Indian in United States Government bonds, * * *" Act of May 25, 1918, ch. 86, § 28, 40 Stat. 591; *see* 55 Cong.Rec. 3438 (1917). Legislative history of this statute suggests strongly that IMPL funds were meant to be included in the monies which were available for such investment. *See ibid; Hearings on S. 8272 Before the Senate Comm. on Indian Affairs*, 64th Cong., 2d Sess. 46 (1917) (Testimony of Ass't Comm'r of Indian Affairs); Combined Statement of the Receipts and Disbursements, Balances, etc. of the United States During the Fiscal Year Ended June 30, 1917 at 140–42 (1918). It appears that the statute went unused and the funds remained fallow in the Treasury. *See* S.Rep. No. 1396, 70th Cong., 2d Sess. 1–2 (1929).

ductive, coupled with a jurisdictional act (here the Indian Claims Commission Act, 25 U.S.C. § 70 et seq.) giving the appellants a forum in which to bring their action, the United States may incur trust duties which are unenforceable. *See United States ex rel. Angarica v. Bayard*, 4 Mackey 310, 327–28 (D.C.Sup. Ct.1885), *aff'd*, 127 U.S. 251, 8 S.Ct. 1156, 32 L.Ed. 159 (1888). However, to me the plain words of the 1841 statute required defendant to invest plaintiffs' "Indian Money, Proceeds of Labor" (IMPL) funds and the interest accruing, at a rate of not less than five percent per annum. Having failed to do so, the defendant must be held for damages.

The opinion of the Indian Claims Commission describes in great detail the history of the 1841 law, both prior and subsequent to its passage, and there is no reason to repeat the bulk of what is said there. *See Te-Moak Bands of Western Shoshone Indians v. United States*, 31 Ind.Cl.Comm. 427 (1973). The statute, as noted in the court's opinion, is extremely short and simple, and concerned largely with investments to be made with the money bequeathed to the United States by James Smithson. In section 1, the act repealed that part of an earlier statute which had provided that interest accruing on the funds would be invested in state "stocks,"[2] and provided that the interest would be invested "in any stock of the United States bearing a rate of interest of not less than five per centum per annum." Section 2 of the act then provided:

> That all other funds held in trust by the United States, and the annual interest accruing thereon, when not otherwise required by treaty, shall in like manner be invested in stocks of the United States, bearing a like rate of interest.

While the primary purpose of the legislation was undoubtedly to protect the Smithson bequest from disappearing as states defaulted on their bonds, the language of section 2 is broader in two respects. First, it applies to "all other funds held in trust," and second, it directs investment at a specified rate of return, not simply, as the Government contends, investment in United States securities. This point of a set rate of return was not slipped into the legislation unwittingly—the original House bill did not contain such a provision, which was added by the Senate Finance Committee. The "when not otherwise required by treaty" language was also added in the Senate, in response to the specific objections of Senator Sevier that the act conflicted with the provisions of earlier treaties. 10 Cong. Globe 422 (1841). This addition makes extremely questionable the Government's current contention that the 1841 statute is applicable only when a treaty or statute already required the investment of funds, since this was precisely the case excluded (to the extent of any inconsistency) from the statute on Senator Sevier's request.

As the opinion of the Indian Claims Commission shows, the history of administrative compliance with even the part of the 1841 act requiring that trust funds be invested in United States stocks was extremely spotty. There were almost as many times after 1841 when new or matured trust funds (from treaties not requiring investment in state stocks) were invested in state rather than United States securities as there were instances when such investment was refused because of the 1841 mandate. 31 Ind.Cl.Comm. at 474–77. An inconsistent administrative interpretation of a statute is entitled to little deference by this court, particularly where the statute itself is simple and straightforward. *Federal Maritime Commission v. Seatrain Lines, Inc.*, 411 U.S. 726, 745–46, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *see United Housing Foundation, Inc. v. Forman*, —— U.S. ——, —— n. 24, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The court stresses the failure of the authorities to apply the act to the IMPL funds but that seems to me because the statute was neglected not that a con-

---

**2.** During this period, "stock" included debt instruments.

scious and reasoned decision was made that it failed to govern. The administrative practice is not helpful, one way or the other.

We do, however, have other sources to turn to for an indication of what the statute meant to those closer to its passage then we are. The major evidence of the legislative reading of the 1841 statute is in the debates surrounding passage of the Act of April 1, 1880, ch. 41, 21 Stat. 70, which authorized the payment of interest by the Treasury in lieu of investment for certain classes of Indian funds.[3] By 1880, a problem Senator Calhoun had foreseen in 1841 arose—there were no available United States securities which paid interest of 5% or more. The draft of the law which reached the Senate floor provided that in lieu of investment, the Secretary of Interior could deposit Indian funds in the Treasury at 4 percent interest. 10 Cong. Rec. 212 (1880). On the Senate floor, Senator Allison objected that such a statute would breach various treaties under which the United States had agreed to invest Indian funds at 5% *and also would be contrary to the obligation assumed in the 1841 act* which was held to be separate from and additional to obligations to invest found in various treaties. *Ibid.* at 213–15, 720. The bill was amended to delete the 4% interest provision and to provide that "the United States shall pay interest semi-annually, from the date of deposit of any and all such sums in the United States Treasury, at the rate per annum stipulated by treaties *or prescribed by law,* . . ." Act of April 1, 1880, ch. 41, 21 Stat. 70 (emphasis added); *see* S.Rep. No. 186, 46th Cong., 2d Sess. 1–2 (1880). While this history is of course not definitive, I find that at least the Senate, only 39 years after 1841, thought that the earlier statute created an obligation to invest *all* Indian trust funds and the interest accruing thereon, whether required by treaty or not, in United States bonds not paying less than 5% interest.

Judicial construction of the 1841 statute has been almost as sparse as legislative interpretation, but what little there is supports this position. There are several cases in which the statute is merely mentioned in passing, probably because the parties in their briefs treated it as an alternative theory on a minor point. In *United States v. Blackfeather,* 155 U.S. 180, 15 S.Ct. 64, 39 L.Ed. 114 (1894), the Supreme Court refused to consider the Indians' claim for interest under the 1880 statute (which had been denied by the Court of Claims) because the Indians failed to cross-appeal. 155 U.S. at 186, 15 S.Ct. 64. However, the Court did cite the 1841 statute as that governing "the interest paid upon funds held in trust" without any limitation. *Ibid.* at 192, 15 S.Ct. at 69. In *United States v. Omaha Tribe of Indians,* 253 U.S. 275, 40 S.Ct. 522, 64 L.Ed. 901 (1920), the Indians made a general equitable claim for interest based largely on the grant of equity jurisdiction in the special jurisdictional act, mentioning the 1841 Act only once. Brief of the Omaha Tribe of Indians at 21–32. The Government brief entirely ignored the 1841 statute. Government Brief at 9–12. The Supreme Court denied the interest claim, not because the 1841 statute did not apply, but because no trust fund had ever been created. 253 U.S. at 282–83, 40 S.Ct. 522.

This same theory underlay the denial of interest in *Cherokee Nation v. United States,* 270 U.S. 476, 46 S.Ct. 428, 70 L.Ed. 694 (1926). This was an extremely complex case in which the Cherokees claimed about $2,000,000 in essentially compound interest on claims which had earlier been decided in their favor, with interest. *United States v. Cherokee Nation,* 202 U.S. 101, 26 S.Ct. 588, 50 L.Ed. 949 (1906). Again, the 1841 statute was discussed only briefly, with most of the parties' energies devoted to determining what the earlier decision had meant. In addition, the parties appear to have been talking past each other. The Indians claimed that the earlier decision retroac-

---

**3.** There is no question that the 1880 statute does not apply to IMPL funds which are not within the delimited categories of funds covered by that act.

tively returned funds to admittedly interest-bearing accounts as of March 4, 1895, and that the law of 1841 provided that the rate of return on those funds should be 5%. Reply Brief of Appellant at 9–11. The Government, on the other hand, contended that there had been no constructive return to interest-bearing accounts in 1895, and therefore that if interest were to be allowed on the claims, it should be from the time of the original treaty breaches (which had occurred as early as 1819), which would amount to an extremely large sum (contended to be "comparable in size to the national debt," but this was probably an exaggeration). Brief for the United States at 32–36.

The Supreme Court decided the issue on two grounds. First, it held that no funds had been held in trust for the Indians because the United States had *not*, either in 1819 or 1895, returned the moneys due the Indians to their trust funds in the Treasury. Second, the Court found that by an 1850 agreement, the Cherokees had agreed that interest on all debts owed them would be at 5% simple interest, and that more than this had already been paid. 270 U.S. at 492, 46 S.Ct. 428. The second theory is irrelevant to our case. However, the first theory is what distinguishes the claim of the Te-Moaks on cross-appeal from the major claim in this case. Like the Court I am of the view that where there are no funds held in trust for a tribe *even though money is due and owing under a treaty or because of defalcations*, the laws requiring either investment of trust funds or payment of interest on them are not applicable. This is so because in the absence of a trust fund, the Indians' only claim to monies due is as a debt,

upon which no interest is available except where explicitly provided by statute, contract or treaty. *See Confederated Salish & Kootenai Tribes v. United States*, 175 Ct.Cl. 451, *cert. denied*, 385 U.S. 921, 87 S.Ct. 228, 17 L.Ed.2d 145 (1966) (Davis, J.)[4] An analysis of the two major Supreme Court cases holding that no interest would be allowed on a Court of Claims judgment shows that they turn on the theory that the amount due the plaintiff is due as debt, and not as beneficial owner of a trust fund such that the 1841 statute applies. *See United States v. Thayer-West Point Hotel Co.*, 329 U.S. 585, 588–89, 67 S.Ct. 398, 91 L.Ed. 521 (1947); *Goltra v. United States*, 312 U.S. 203, 211, 61 S.Ct. 487, 85 L.Ed. 776 (1941).[5]

The case in which there is the most complete discussion of the 1841 statute is *United States ex rel. Angarica v. Bayard*, 127 U.S. 251, 8 S.Ct. 1156, 32 L.Ed. 159 (1888), the facts of which are set out in the majority opinion. The Supreme Court never reached the issue of the applicability of the 1841 Act because it found that the money collected from the Spanish government, on which Angarica demanded interest, had been collected by the United States in its own right and not in trust for Angarica. 127 U.S. at 259, 8 S.Ct. 1156. As in the *Omaha* case, *supra*, the necessary predicate for application of the 1841 law—a trust fund—was missing.

The District of Columbia Supreme Court (where the case had been brought originally) did, however, comment extensively on the 1841 statute although it too found the law inapplicable. *United States ex rel. Angarica v. Bayard, supra*, 4 Mackey at 322. The court found that the 1841 statute applied only to trusts

---

**4.** For this same reason, I disagree with the Commission's damages accounting to the extent that it "returns" disallowed disbursements to the IMPL fund before calculating damages. *Te-Moak Bands of Western Shoshone Indians v. United States*, 33 Ind.Cl.Comm. 417, 428 (1974).

**5.** *United States v. N. Y. Rayon Importing Co.*, 329 U.S. 654, 67 S.Ct. 601, 91 L.Ed. 577 (1947), did involve a trust fund. However, neither the

parties nor the Court discussed the 1841 Act— the entire claim was based on equitable grounds that interest was "right and just." *Ibid.* at 659, 67 S.Ct. 601. The trust fund there involved, moreover, was rather unusual in that it was, by the terms of the statute under which it was created, to be dissolved at the end of two years and the money to return to the United States not the beneficial owner. Act of June 26, 1934, ch. 756, § 21, 48 Stat. 1235.

which had three characteristics missing in Angarica's case:

(1) That the funds were deposited in the Treasury rather than retained by a department.

(2) That the funds were to be invested by the Secretary of the Treasury rather than by the head of any other department, and

(3) That the funds could not be disbursed without congressional authorization. *Ibid.* at 324.

All these characteristics are present in the case of the IMPL funds.

When Congress, by a rider to the Deficiency Appropriations Act of 1883, ch. 141, 22 Stat. 590, required that miscellaneous revenues from Indian reservations be "covered into the Treasury for the benefit of such tribe * * *," the Secretary of the Interior and the Commissioner of Indian Affairs intended to treat the fund as the Secretary of State had treated Angarica's money—as essentially a checking account, totally under the control of the Secretary of Interior. *See* Letter from the Secretary of the Interior to the Commissioner of Indian Affairs, dated April 19, 1883; Letter from Commissioner of Indian Affairs to the Secretary of the Interior, dated November 14, 1883. The Acting Secretary of the Treasury, however, determined that the act created a fund with the characteristics described in *Angarica.* The money was to be taken out of direct control of the department and deposited in the Treasury (this was agreed by all as the purpose of the act); investments were to be handled by the Secretary of the Treasury (under the Act of June 10, 1876, ch. 122, 19 Stat. 58, *now codified at* 25 U.S.C. § 160); and, most tellingly, the funds could not be touched by the Department of the Interior or the Indians until Congress specifically authorized such actions (*see* Letter from Acting

Secretary of the Treasury to the Secretary of the Interior, dated November 26, 1883). In 1887 Congress, at the urging of the Secretary of the Interior, did make the authorization demanded by the Treasury Department, but in doing so emphasized the trust nature of the funds by declaring that the money must be used for the benefit of the tribes which had produced the revenue. Act of March 2, 1887, ch. 320, 24 Stat. 463.

This court has considered the scope of the 1841 Act twice, both times very briefly, and has reached contrary conclusions about the act's applicability to non-treaty trust funds.[6] In *Bonnar v. United States*, 438 F.2d 540, 194 Ct.Cl. 103 (1971), as the majority opinion notes, we rejected the act's application to funds held under the Trading With the Enemy Act, 50 U.S.C. App. § 9(a) (1970), on two grounds, the most important of which, we said, was that the Act, by its own terms, explicitly limited recovery to the net proceeds of sale. 438 F.2d at 572–574, 194 Ct.Cl. at 163–64. We also stated that the Trading With the Enemy Act should have referenced the 1841 Act if that statute was meant to apply. *Ibid.* at 572, 194 Ct.Cl. at 163. It is a maxim of construction that general statutes apply to later specific acts unless the later act is clearly inconsistent with the former. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 133–34, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). It may well be that section 7(c) of the Trading With the Enemy Act, which limits recovery to net proceeds, *is* inconsistent with the 1841 law and that therefore the earlier statute did not apply. However, we do not have such a case here, and the failure of the 1883 statute to make reference to the 1841 act should not bar the application of the first-passed statute.

The second case in which we have considered the 1841 Act is more on point.

---

6. In *Creek Nation v. United States*, 78 Ct.Cl. 474 (1933), which the majority cites for the proposition that no interest is payable on IMPL funds, Majority Op. at 32–33, the Creeks argued strongly that their money should never have been put in an IMPL fund, since the Five

Civilized Tribes were excluded from the 1883 Act, and never requested interest on such a fund. Plaintiff's Request for Findings of Fact and Brief at 49–51. This is another case, furthermore, in which neither party ever mentioned the 1841 Act.

In *Confederated Salish & Kootenai Tribes v. United States*, we were asked, among other things, to decide whether interest on plaintiff's trust fund "Proceeds of Flathead Reservation, Montana" should be granted pursuant to the 1880 Statute, 25 U.S.C. § 161. It will be remembered that that statute provides that certain funds might be kept in the Treasury in lieu of investment, with interest paid "at the rate per annum stipulated by treaties or prescribed by law." No treaty or particular act of Congress required that the proceeds of the Flathead Reservation be invested or that interest be paid, although the Act of April 23, 1904, ch. 1495, § 14, 33 Stat. 305, did provide that the funds received were to be paid into the Treasury and expended "for the benefit of said Indians." The plaintiffs argued that their funds were clearly proceeds of "Indian trust lands" and therefore entitled to interest under the 1880 statute, at the rate of 5% *as provided by the law of 1841.* Motion for Instructions to the Commissioner, etc. at 1 (filed Aug. 15, 1968). The government responded that the 1841 statute was inapplicable in construing the 1880 law. Response to Motion for Instructions, etc. at 8–9 (filed Oct. 23, 1968). This court found for the plaintiff, and in doing so necessarily concluded, contrary to defendant's present assertions, that the 1841 law is applicable to funds for which no special investment provision in a law or treaty exists. Order, *Confederated Salish & Kootenai Tribes v. United States* (Dec. 9, 1968), *reported at* 186 Ct.Cl. 947.

That the IMPL fund created by these statutes is a trust fund is conceded by the government. Brief of United States at 47;[7] *see Cheyenne-Arapaho Tribes v.*

*United States, supra,* 512 F.2d at 1392, 206 Ct.Cl. at ——. The infirmity which prevented recovery by the *Omahas* and *Angarica, supra,* is therefore not present here. Rather, the government relies on two other propositions to deny application to the plain letter of the 1841 statute. First, the point is made the act applies only to "trusts of a definite character," upon which a treaty or another act of Congress provided that interest should be paid or the fund invested. There are three answers to this. First, the "trusts of a definite character" language comes from the District of Columbia Supreme Court decision in *Angarica.* As we have shown, the IMPL fund falls within the class as to which that court found the 1841 Act to apply. Second, we have already rejected the argument that another treaty or act is required as a predicate for application of the 1841 Act in the *Confederated Salish* case, and that decision should govern here. Third, the terms of the statute are not so restricted and there is insufficient reason in its history to read it so narrowly.

The defendant's second ground for rejecting application of the 1841 Act is simply that it would cost too much now to penalize the government for failure to comply with the statute from 1883 to 1930.[8] Damages for failure to comply from 1883 to 1930 are the lost profits which would have resulted from the investments. Since the 1841 Act provides a *minimum* return on investment of 5% compounded, and the Indians have not cross-appealed on the Commission's failure to use a higher rate, I agree with the Commission that damages should be figured at 5% interest compounded annually, on the *actual* annual surplus in the IMPL fund. (See note 4, *supra.*) My

7. In 1934, Congress specifically declared the IMPL fund to be a "trust fund." Act of June 26, 1934, ch. 756, § 20(20), 48 Stat. 1233, *now codified at* 31 U.S.C. § 725s(20) (1970). While this action came after the statute providing that interest be paid on such funds, Act of June 13, 1930, ch. 483, § 2, 46 Stat. 584, neither that statute nor any other after 1887 altered the terms of the original statute which had provided that the funds were to be held

"for the benefit" of the Indians. This later Congressional action, therefore, may be seen as a ratification of its earlier intent to treat IMPL funds as a trust fund.

8. Since no claim is made for damages after 1930, I leave to another day the issue whether the Act of June 13, 1930, ch. 483, § 2, 46 Stat. 584, providing simple interest at 4% on IMPL funds held in the Treasury, superseded the 1841 statute.

own, admittedly rough, calculations lead me to believe that the damages payable to all Indian tribes for lost profits on the IMPL account from 1883 to 1930 will not exceed $15,000,000.[9] Even if I am mistaken in that, I remain convinced that the law is as I have previously stated in response to a similar governmental claim:

> It is irrelevant that an award of interest, pursuant to the [1841 statute], could increase the award to plaintiff by five or six times. If the [statute] so provides, we cannot refuse interest because the amount is relatively large. *Peoria Tribe v. United States,* 177 Ct.Cl. 762, 770, 775 n. 6 (1966) (Davis, J., dissenting), *rev'd,* 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968).

The 1841 statute provides the Indians with a right to recover within the jurisdiction created by paragraph (1) of the Indian Claims Commission Act—"claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President," 25 U.S.C. § 70a(1) (1970). This language tracks that of the early special jurisdictional statutes, and as such does not create any equitable right to enforce general trust duties undertaken by the United States where, for some reason, the 1841 statute is inapplicable. *See United States v. Omaha Tribe of Indians, supra,* 253 U.S. at 283, 40 S.Ct. 522.

However, in establishing the Indian Claims Commission Congress did not, as we have noted many times before, merely consolidate all the old special jurisdictional acts. It went further, providing a new cause of action for "claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." 25 U.S.C. § 70a(5). *See Otoe and Missouria Tribe of Indians v. United States,* 131 F.Supp. 265, 271, 131 Ct.Cl. 593, 602, *cert. denied,* 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955). This does not mean that the United States has agreed to pay the Indians for all pre-1946 wrongs. *Gila River Pima-Maricopa Indian Community v. United States,* 427 F.2d 1194, 1197–98, 190 Ct.Cl. 790, 797, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970). We have, however, determined that such a clause does extend government liability when three conditions are met; first, that there be an express undertaking by the United States, by treaty, agreement, executive order, or statute, of a duty of trustee toward the Indians; second, that the United States has failed to meet its obligations; and third that the tribe has suffered damages as a result. *Aleut Community of St. Paul Island v. United States,* 480 F.2d 831, 838–39, 202 Ct.Cl. 182, 196 (1973). These three conditions are met here, and should result in recovery by the Indians of profits lost by breach of fiduciary duty by the United States, although the measure of damages under traditional trust law, lost profits at simple interest, differs from that mandated by the 1841 Act. *See Ute Tribe of Indians v. United States,* 45 Ct.Cl. 440, 470 (1910).

In 1883, by statute, Congress declared that money admittedly belonging to the Indians would, instead of being given to the Indians, be "covered into the Treasury for the benefit of such tribe." Act of March 3, 1883, ch. 141, 22 Stat. 590. In 1887, the Secretary of the Interior was, again by statute, explicitly given the power to use these funds, but only for the benefit of the tribes on whose account the funds had originally been added to the fund. Act of March 2, 1887, ch. 320, 24 Stat. 463. These two statutes, in the most traditional sense, created a trust for the benefit of the Indians, a fact belatedly recognized by the Treasury in 1908. 2 J. Story, Commentaries on Equity Jurisprudence, § 980 (1836); *see* Restatement of Trusts 2d, § 24, comm. b, illus. 1 (1959); *Te-Moak Bands of Western Shoshone Indians v. United States, supra,* 31 Ind.Cl. Comm. at 506–508.

---

**9.** As stated above, *supra,* note 4, these damages are calculated on the basis of actual surplus funds in the Treasury, and do not include damages on illegal disbursements.

Under standard trust law, which has remained largely constant through the last century, a trustee's duties include (unless explicitly negated by the terms of the trust, not a problem here) the obligation to make trust funds productive by investing whatever money is not required by the terms of the trust to be distributed. *See* Restatement of Trusts 2d, Introductory Note at 1, § 181 (1959). From 1883 to 1887, the terms of the statute permitted no disbursal at all, so the duty arose to make the entire amount in the fund productive. The 1887 Act amended the terms of the trust to allow the Secretary of the Interior to spend the funds in the IMPL fund for the benefit of the tribe on whose account the money was covered into the Treasury. From 1887 on, then, the duty to make funds productive was limited to surpluses remaining in the account, after charges, which would not be needed in the reasonably foreseeable future. When the annual surplus in the total IMPL fund for all Indians which, according to Treasury Department reports, fell below $1,000,000 for only one year (fiscal 1925) between 1902 and 1930 and reached to over $9,000,000 in fiscal 1923,[10] was left to lie fallow earning absolutely no interest, the tribes to whom portions of the fund belonged suffered sufficient damage to allow recovery un-

der the fair and honorable dealings clause for the breach of trust. This is wholly apart from the 1841 Act and furnishes an alternative and supplementary ground for recovery by the appellees.

---

10. *See* Statement of Balances, Appropriations, and Expenditures of the Government for the Fiscal Year Ended June 30, 1902 at 98–99 (no date); *Ibid.* for the Fiscal Year Ended June 30, 1903 at 116–17 (no date); *Ibid.* for the Fiscal Year Ended June 30, 1904 at 114–15 (no date); *Ibid.* for the Fiscal Year Ended June 30, 1905 at 118–19 (no date); *Ibid.* for the Fiscal Year Ended June 30, 1906 at 108–09 (1907); *Ibid.* for the Fiscal Year Ended June 30, 1907 at 144–45 (1908); Statement of Balances, Appropriations, and Disbursements of the Government for the Fiscal Year Ended June 30, 1908 at 124–25 (1908); *Ibid.* for the Fiscal Year Ended June 30, 1909 at 138–39 (1909); *Ibid.* for the Fiscal Year Ended June 30, 1910 at 128–29 (1911); *Ibid.* for the Fiscal Year Ended June 30, 1911 at 146–47 (1912); Combined Statement of the Receipts and Disbursements, Balances, etc., of the United States for the Fiscal Year Ended June 30, 1912 at 105 (1912); *Ibid.* for the Fiscal Year Ended June 30, 1913 at 121 (1913); *Ibid.* for the Fiscal Year Ended June 30, 1914 at 124 (1914); *Ibid.* for the Fiscal Year Ended June 30, 1915 at 142 (1915); *Ibid.* for the Fiscal Year Ended June 30, 1916 at 128 (1916); *Ibid.* for the Fiscal Year Ended June 30, 1917 at 142 (1918); *Ibid.* for the Fiscal Year Ended June 30, 1918 at 142 (1919); *Ibid.* for the Fiscal Year Ended June 30, 1919 at 154 (1920); *Ibid.* for the Fiscal Year Ended June 30, 1920 at 162 (1921); *Ibid.* for the Fiscal Year Ended June 30, 1921 at 173 (1921); *Ibid.* for the Fiscal Year Ended June 30, 1922 at 176 (1923); *Ibid.* for the Fiscal Year Ended June 30, 1923 at 101 (1924); *Ibid.* for the Fiscal Year Ended June 30, 1924 at 103 (1925); *Ibid.* for the Fiscal Year Ended June 30, 1925 at 107 (1926); *Ibid.* for the Fiscal Year Ended June 30, 1926 at 106 (1927); *Ibid.* for the Fiscal Year Ended June 30, 1927 at 157 (1928); *Ibid.* for the Fiscal Year Ended June 30, 1928 at 157 (1929); *Ibid.* for the Fiscal Year Ended June 30, 1929 at 155 (1930); *Ibid.* for the Fiscal Year Ended June 30, 1930 at 332 (1931).